UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11958-RGS

| | |
|---|---|
| MARTIN J. GALVIN, JR. ED.D.,<br>    Plaintiff | )<br>)<br>) |
| v. | )<br>) |
| THE TOWN OF YARMOUTH,<br>PETER L. CARNES AND STEVEN XIARHOS,<br>    Defendants. | )<br>)<br>) |

DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
SUMMARY JUDGMENT

I.    INTRODUCTION.

The plaintiff's claims arise from the disclosure of his protective custody

detention on July 4, 2001, in Yarmouth, Massachusetts. On that date, officers of

the Yarmouth Police Department placed the plaintiff in protective custody for

being incapacitated by reason of the consumption of alcohol, to the point where

he was "likely to suffer or cause physical harm or damage property, or . . . [was]

disorderly" G.L. c. 111B §§ 3, 8. The next day, Yarmouth Police Lieutenant

Steven Xiarhos faxed the relevant incident reports to Mr. Galvin's employer.

All defendants now move for summary judgment. There are no material

facts in dispute and they are entitled to judgment as a matter of law.

II.    CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS.

For the purposes of this motion only, the defendants set forth the following

statement of undisputed material facts, as required by Local Rule 56.1.

1. The plaintiff is a resident of Waterbury, Connecticut, and on the date of his

    protective custody detention, had been employed by the Waterbury Public

    Schools as the principal of Wilby High School since 1993. Plaintiff's

Amended Complaint (hereinafter Tab 1), ¶2; Deposition of Martin Galvin (hereinafter Tab 2), p. 29.

2.  On July 4, 2001, officers of the Yarmouth Police Department responded to a report of a verbal altercation. Facsimile from Lt. Xiarhos to Waterbury Public School (Jul. 5, 2001)(hereinafter Tab 3), p. 5.

3.  Neighbors had witnessed Mr. Galvin causing a disturbance and he was highly intoxicated. Galvin was taken into protective custody due to his incapacitation. His blood alcohol content was measured by a breathalyzer during processing at the Yarmouth Police station, and recorded as .21. Tab 3, pp. 5-7.

4.  According to the Yarmouth Police, Mr. Galvin had shouted verbal abuse over a local family's backyard fence. Galvin's words were directed at an off-duty Yarmouth Police officer who was at home, grilling food for his 8 and 9-year old daughters. Galvin allegedly yelled, among other things, "Fuck you, fuck you Lou," and "I'll get you. You will get yours. Fuck you." When asked to stop swearing in front of the children, Galvin responded, "I don't care about your goddamn daughters." Tab 3, p. 5.

5.  On July 5, 2001, Lieutenant Steven Xiarhos of the Yarmouth Police Department issued an internal incident synopsis within the Department broadly describing the events that occurred on the previous day. Tab 3, p. 2.

6.  On the same day, Lt. Xiarhos sent, by telephone facsimile, copies of the incident synopsis and associated police reports to Mr. Galvin's employer, the Waterbury Public Schools. Tab 3; see also Deposition of Dr. David Snead (hereinafter Tab 4), p. 38-39.

7. Mr. Galvin's first claim for damages is that the disclosure of information by the defendants resulted in a less favorable allocation of assets and alimony in his divorce. Tab 1, ¶17.

8. At his deposition, Mr. Galvin was unable to point to any evidence to show that the Yarmouth incident resulted in a more favorable divorce decree for his wife. Tab 2, p. 240-242, 273.

9. During Mr. Galvin's divorce proceeding, no testimony or exhibits of any kind relating to the Yarmouth Police department were entered. Tab 2, pp. 236-237, 239-240; see also Tr. 69-70, Galvin v. Galvin, (hereinafter Tab 5).

10. Galvin has no evidence that the court presiding over his divorce was even aware of the Yarmouth incident. Tab 2, pp. 235, 239-241, 246, 258-260.

11. During Mr. Galvin's final divorce hearing on July 19, 2001, the Yarmouth incident was arguably touched upon only when Mr. Galvin was asked if he had been arrested recently on Cape Cod. He answered in the negative and the issue was not discussed further. Tab 5, pp. 69-70.

12. The court explicitly decided that Mr. Galvin's behavior, specifically his three extramarital affairs and his excessive use of alcohol, was the primary cause of the marital breakdown. Tab 5, pp. 4.

13. The court ordered all substantial assets, including the primary residence and Galvin's pension, to be split evenly. Dissolution of Marriage Judgment, Galvin v. Galvin, (hereinafter Tab 6).

14. Galvin also admitted he has never even read the divorce decree. Tab 2, p. 241.

15. Mr. Galvin's second claim is that the disclosure of information by Lt. Xiarhos resulted in his constructive termination, transfer and demotion from his job as principal of Wilby High School to another position. Tab 1, ¶18.

16. On April 18, 2002, it was publicly announced that Wilby High School had failed all standards in its recent accreditation review. Randal Edgar, <u>Wilby, Crosby put on notice – Regional board says standards not being met</u>, Waterbury Republican-American 1A (Apr. 18, 2002)(hereinafter Tab 7).

17. The local paper reported that Wilby High School was the only school out of 641 schools accredited by the New England Association of Schools and Colleges to fail each and every accreditation standard, although it had successfully completed its previous accreditation review in 1991. Cindy F. Crawford and Robyn Adams, <u>Wilby principal removed</u>, Waterbury Republican-American 1A (Apr. 24, 2002)(hereinafter Tab 8).

18. On April 22, 2002, just four days after the final accreditation report of the New England Association of Schools and Colleges was publicized, Mr. Galvin was transferred from his position as principal of Wilby High School and made principal of the Adult Education High School Program. Tab 8; see also Letter from Galvin to Snead, (May 8, 2002)(hereinafter Tab 9 p. 1).

19. Mr. Galvin's salary did not changed when he was transferred. Tab 2, p. 228-232.

20. Before this suit was filed, the Superintendent of Waterbury Public Schools stated in a letter to Mr. Galvin that the transfer was specifically due to concerns about Mr. Galvin's leadership at Wilby High School. Letter from Snead to Galvin, (May 20, 2002)(hereinafter Tab 9, p. 2).   The Superintendent

also stated at deposition that the Yarmouth incident played no role in the decision to transfer Galvin to a new position. Tab 4, p. 64.

21. The Superintendent of Schools also declared that he did not take any negative or disciplinary action against Mr. Galvin based on the information provided to him by Lt. Xiarhos, other than an informal face-to-face warning that any criminal conviction could impact negatively on his employment. Tab 4, pp. 43-44, 78-79.

22. A large amount of local media attention was focused on Wilby High School's failure to meet any of the accreditation standards. Tab 1, ¶19. However, Galvin knows of no broadcast, print or news media of any description that ever publicized any information relating to the incident or any material released by the Lt. Xiarhos. Tab 2, pp. 144-146.

23. Mr. Galvin admits he has no medical documentation or record of treatment connecting emotional distress with any physical symptoms. Tab 2, p. 224-227.

## III.   ARGUMENT.

### A.   Summary Judgment Standard.

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Cabot Safety Intermediate Corporation v. Akron Safety Equipment, 44 F.Supp.2d 375, 376 (D.Mass. 1999)(quoting Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991)). Once the moving party shows the absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to establish affirmatively the existence of genuine material issues of fact. FDIC v. Municipality of Ponce, 904 F.2d 740, 742 (1st Cir. 1990). Thus, the non-moving party cannot rely on the "mere allegations or denials of [its] pleadings" to avoid

entry of judgment, but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In this case, summary judgment is appropriate because the pleadings and exhibits show that there is no genuine issue as to any material fact and that the defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See also <u>Hinchey v. Nynex Corp.</u>, 144 F.3d 134, 140 (1st Cir. 1998).

B. <u>The plaintiff's claims must fail as a matter of law because the information was public record and because the recipient was authorized to receive the information.</u>

According to G.L. c. 6 § 172, "criminal offender record information, and where present, evaluative information, shall be disseminated, whether directly or through any intermediary, only to (a) criminal justice agencies; (b) *such agencies and individuals required to have access to such information*...and (c) *any other agencies and individuals where it has been determined that the public interest in disseminating such information to these parties clearly outweighs the interest in security and privacy.*" (emphasis added). The essence of the plaintiff's claim is that the defendants, in reporting the facts of the protective custody detention to the Waterbury Schools, gave out information that should not have been disclosed. Tab 1, ¶1. However, the plaintiff's claim cannot succeed because the information disclosed was public record, it was not protected Criminal Offender Record Information (CORI), the Waterbury Public Schools was legally permitted to receive such information and because public policy weighs in favor of disclosure of Mr. Galvin's actions to his employer.

1.    The disseminated information was public record not protected as
       CORI.

In order for the plaintiff to succeed on his wrongful dissemination claim,

he must show that the information disclosed to the Waterbury Schools was

CORI, and protected by Massachusetts law. But the information at issue cannot

properly be characterized as CORI or confidential.

First, under Massachusetts law, protective custody records are public

records and are not protected or confidential. Mass. Atty. Gen. Op. p. 48 (July 17,

1973).

Next, according to G.L. c. 111B § 8, those held in protective custody "shall

not be considered to have been arrested or to have been charged with any

crime." The statute further states that records maintained pursuant to the

protective custody statute, requiring an entry of custody to be made, including

the date, time, and place of custody, and breathalyzer results "shall *not* be treated

for any purposes, as an arrest or criminal record." Id. (emphasis added). Thus, a

protective custody entry is not part of a criminal record and the information

released by Lt. Xiarhos should not be considered CORI,[1] as it was non-criminal in

nature and in any case, readily and legally available as public record. See

_____

[1] CORI is defined as:

[R]ecords and data in any communicable form compiled by a criminal
justice agency which concern an identifiable individual and relate to the nature
or disposition of a criminal charge, an arrest, a pre-trial proceeding, other judicial
sentencing, incarceration, rehabilitation, or release. *Such information shall be
restricted to that recorded as the result of the initiation of criminal proceedings* or any
consequent proceedings related thereto.

G.L. c. 6 § 172. (emphasis added).

Mass.Atty.Gen.Op. p. 48 (July 17, 1973)(records maintained pursuant to G.L. c. 111B, § 8 are public records).

In addition, the protective custody statute protects the actions of Lt. Xiarhos. According to G.L. c. 111B § 13, "Police officers...acting in a reasonable manner and pursuant to the provisions of this chapter shall not be held criminally or civilly liable for such acts." As the actions of the police were reasonable and conducted pursuant to c. 111B, all claims raised by the plaintiff that stem from this incident should be barred as a matter of law.

2. <u>Lt. Xiarhos was permitted to release, and the recipients were authorized to receive the information at issue.</u>

Even if the information sent to the Waterbury Public Schools were somehow confidential or CORI-protected, the school system was an authorized recipient and Lt. Xiarhos was explicitly permitted to release the information under both Massachusetts and Connecticut law.

Under Massachusetts law, school systems <u>must</u> obtain CORI information on all employees:

> The school committee and superintendent of any city, town, or regional school district and the principal, by whatever title and position be known, of a public and accredited private school of any city, town or regional school district *shall have access to* and *shall obtain* all available criminal offender record information from the criminal history systems board of any current or prospective employee or volunteer of the school department.

G.L. c. 71 § 38R (emphasis added). The Massachusetts Appeals Court has stated that the legislative purpose of § 38R is to allow schools "to consider criminal offender record information for the purpose of protecting students." <u>Town of Burlington v. McCarthy</u>, 60 Mass.App.Ct. 914, 916 (2004). Therefore, it is

reasonable for Lt. Xiarhos to believe that dissemination of the information would also be permitted for the protection of children in Connecticut.

In fact, Connecticut law requires "any person hired prior to said date [July 1, 1994] to submit to state and national criminal history records checks..." Conn. Gen. Stat. § 10-221d(a)(2).[2] The statute goes on to state that "[i]f the local or regional board of education receives notice of a conviction or a crime which has not previously been disclosed by such person to the board, the board may (i) terminate the contract of the certified employee." § 10-221d(a). The criminal records check is an ongoing process and the state board of educators is required, under the same statute, to periodically submit a database of all certified teachers[3] to the State Police Bureau of Identification for periodic criminal background checks. § 10-221d(f). Thus, under Massachusetts and Connecticut law the Waterbury Public Schools is an authorized recipient of criminal record information.

Massachusetts administrative law further upholds the disclosure. Under 803 C.M.R. § 2.04(5)(a), a "criminal justice agency with official responsibility for a pending criminal investigation or prosecution may disseminate CORI that is specifically related to and contemporaneous with an investigation or prosecution." The disclosure of an employee's criminal background to an employer is protected by this regulation. Bellin v. Kelley, 435 Mass. 261, 265-269 (2001). In these circumstances, Lt. Xiarhos was clearly permitted to release the information to the Waterbury Public Schools, an authorized recipient responsible for the safety and education of children.

_____

[2] Galvin has been an employee of the Waterbury Schools since 1973. Tab 2, p. 20.
[3] Galvin has a number of professional certifications. Tab 2, pp. 22-23.

In <u>Bellin v. Kelley</u>, an employee was fired after his criminal record and the results of a failed polygraph were disclosed to his employer. <u>Id</u>. at 263. The Supreme Judicial Court reasoned that the actions of the police fell within the legislative intent behind the CORI laws, as the disclosure "allowed the employer to take precautions to protect himself and his company from any further criminal acts of a possibly disloyal insider. Leaving a victim in ignorance in such circumstances, and thus completely vulnerable to further criminal acts, would have been viewed as irresponsible on the part of the police." <u>Id</u>. at 269. Here, Lt. Xiarhos was investigating the July 4, 2001 incident, and was authorized to disclose CORI in pursuit of this investigation.

Public policy strongly favors allowing schools to protect themselves and their students from employees who may expose them to troubling liability, as would certainly be the case with a principal who abuses alcohol in the manner of Mr. Galvin. Leaving a school system ignorant of an educator's criminal behavior would be irresponsible. Therefore, even if the information at issue were to be defined as CORI, its disclosure would not be a violation of CORI law under 803 C.M.R. § 2.04(5)(a).

    3.    <u>The plaintiff's privacy was not invaded and Lt. Xiarhos' actions were reasonable</u>.

In addition to the fact that Galvin committed the relevant acts in public and in front of witnesses, he has, as a matter of law, failed to show that his right to privacy has been violated, and all counts depending on this theory, including Count IV, should be dismissed. Additionally, the plaintiff has failed to adduce any evidence that any defendant disseminated the report to his ex-wife or her attorney.

10

In Massachusetts, a person is protected from unreasonable, substantial and serious interference with their privacy. G.L. c. 214 § 1B, <u>Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 409 Mass. 514, 518 (1991); <u>Transamerica Ins. Co. v. KMS Patriot, L.P.</u>, 52 Mass.App.Ct. 189, 196 (2001). The law protects people from public disclosure of private information that is of a highly personal or intimate nature. <u>Dasey v. Anderson</u>, 304 F.3d 148, 153 (1st Cir. 2002). In all cases, "there can be no invasion of privacy where facts, though highly personal, are already in the public domain." <u>Wagner v. City of Holyoke</u>, 241 F.Supp.2d 78, 100 (D.Mass. 2003). "[T]o be actionable, the gathering and dissemination of private facts must also be unreasonable." <u>Dasey v. Anderson</u>, 304 F.3d at 154. Additionally, "activity in the presence of others who owe no duty of confidentiality...is hardly 'private.'" <u>Dasey, supra</u>, 304 F.3d at 154. Mr. Galvin's drunken actions occurred in front of several witnesses, rendering them public knowledge. Tab 2, p. 93; Tab 3, p. 5. Mr. Galvin may be embarrassed by his public problems with alcohol, but that does not constitute an invasion of his privacy.

As previously discussed, records of protective custody detentions are public documents. Therefore, an invasion of privacy did not occur when Lt. Xiarhos distributed the complained-of information, and again, even if the information were considered private, both Massachusetts and Connecticut public school systems have access to criminal records. <u>See</u> G.L. c. 71 § 38R, Conn. Gen. Stat. § 10-221d. The release was not a public disclosure since it went to an entity that was authorized to receive the information, which in any case was authorized to receive even more sensitive criminal record information.

11

In addition to the foregoing statutory authority, the courts have held that, "there are circumstances in which it is legitimate for an employer to know some personal information about its employees, so long as the information reasonably bears upon the employees' fitness for, or discharge of, their employment responsibilities." French v. United Parcel Service, Inc., 2 F.Supp.2d 128, 131 (D.Mass. 1998)(citing Cort v. Bristol-Meyers Co., 385 Mass. 300 (1982)).

In French, the court held that a private corporation has a legitimate reason for seeking out private information regarding its employees when there are "concerns about the soundness of judgment exercised by its supervisory employees in regard to alcohol abuse..." 2 F.Supp.2d at 131. If the concerns of a private corporation are legitimate, then public schools surely have a greater legitimate interest in learning "private" information about current alcohol abuse by employees who are responsible for the safety and education of children. In light of these circumstances, the distribution of the information relating to Mr. Galvin's actions was reasonable.

Finally, the defendants are not liable for the alleged use of the information at Mr. Galvin's divorce proceedings. There is a complete absence of facts suggesting that Lt. Xiarhos released any information to the former Mrs. Galvin or her attorney. There is also overwhelming evidence that none of the information was even before the court during the divorce proceedings. The transcript and record of his divorce proceeding is completely devoid of any reference to the incident or the reports, and Galvin himself cannot say that the report was introduced. Tab 2, pp. 236-237, 239-241.

The plaintiff has failed to put forward sufficient evidence that the information at issue was private, or disclosed improperly. As a matter of law, all

claims put forward by the plaintiff should be dismissed because the
dissemination of information did not violate either Massachusetts or Connecticut
state law and is actually favored by public policy.

C.      The plaintiff's civil rights claims must fail because the release of the
        records did not violate or interfere with any known rights.

In order to succeed on a claim under the Massachusetts Civil Rights Act
("MCRA"), a plaintiff "must prove that (1) his exercise or enjoyment of rights
secured by the Constitution or laws of either the United States or of the
Commonwealth (2) has been interfered with, or attempted to be interfered with,
and (3) that the interference or attempted interference was by 'threats,
intimidation or coercion.'" Bally v. Northeastern University, 403 Mass. 713, 717
(1989); citing G.L. c. 12 §§ 11H and 11I.

To succeed on a claim under 42 U.S.C. § 1983, a plaintiff must prove that:
"(1) the conduct complained of was carried out under color of state law and (2)
this conduct deprived [him] of rights, privileges or immunities secured by the
Constitution or the laws of the United States." Macone v. Town of Wakefield,
277 F.3d 1, 9 (1st Cir. 2002)(citation omitted). In this case, Galvin cannot satisfy
any of the elements of a MCRA claim because no right was interfered with, nor
was there any threat, intimidation, or coercion. Equally, Mr. Galvin has not
adequately put forward a federal civil rights claim because he has failed to
identify a federal right, privilege or immunity that was deprived.

1.      The defendants did not interfere with state or federal rights secured
        to the plaintiff.

The plaintiff asserts that the "Defendants' interference with Plaintiff's
rights included the wrongful disclosure of the Police Report and the CORI
contained therein to Plaintiff's employer, the Waterbury Public Schools, which

was intended to cause and caused a deprivation of Plaintiff's property interests in continued public employment and his occupational liberty interest in preserving his future professional reputation, earning capacity and employment opportunities, and which interfered with Plaintiff's procedural due process rights by means of economic coercion, threats and intimidation." Tab 1, ¶ 27. As argued above, the defendants did not violate CORI law in disclosing the details of the protective custody to the Waterbury Schools. Not only was the information legally disseminated, it did not cause any harm to the plaintiff.

In this case there is a complete absence of evidence suggesting that Mr. Galvin's job transfer was caused or even influenced by the limited dissemination of information by Lt. Xiarhos. In fact, there is ample evidence that Mr. Galvin himself was responsible for his transfer. He was the principal of the only institution out of 641 New England schools to fail all accreditation standards. Tab 7, p. 5A. Local newspapers extensively covered this story; at the same time, there were no stories or public disclosure of any kind regarding Mr. Galvin's stay in protective custody in Yarmouth. Tab 2, pp. 144-146.

In terms of proximity, the job transfer occurred nine months after the alleged CORI violation, but only four days after news about Galvin's school flunking its accreditation test was publicized. Tab 7, p. 5A. The Superintendent of Schools, who made the decision to transfer the plaintiff, made a written statement to Mr. Galvin before he filed this suit that the failure to meet accreditation standards was the reason for the transfer, and repeated this at deposition.[4] Tab 4, p. 64; see also Tab 9, p. 2. To say that the accreditation failure

---

[4] Plaintiff and his counsel chose not to attend the deposition of the Superintendent.

gave the Waterbury Schools independent and sufficient grounds for the transfer understates the situation. The defendants are simply not the cause of Mr. Galvin's transfer.

Finally, the plaintiff's civil rights claims are predicated on the alleged violation of Massachusetts CORI law. Unfortunately for the plaintiff, even "a showing that state law forbids a practice may be insufficient to demonstrate that the practice violated the federal rights that are at issue in a section 1983 action." Bellville v. Town of Northboro, 375 F.3d 25, 31-32 (1st Cir. 2004). Thus, even if Mr. Galvin could show that Lt. Xiarhos violated Massachusetts law, without more, the alleged violation of state law could not satisfy the requirements of a § 1983 claim.

2.    The plaintiff has failed to show the required element of threats, intimidation, or coercion.

The Supreme Judicial Court has stated that under the MCRA "a direct deprivation of rights, even if unlawful, is not coercive because it is not an attempt to force someone to do something the person is not lawfully required to do." Freeman v. Planning Board of West Boylston, 419 Mass. 548, 565 (1995). The MCRA requires that the complained of acts must deprive the plaintiff of both a right secured by law and include threats against, intimidation, or coercion. Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. 467, 473-474 (1994).[5] Taking a persons' property, even if done in bad faith, is not in and of

---

[5] A "threat" is defined as the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. 467, 474 (1994). "Intimidation" is defined as putting another in fear in order to compel or deter conduct. Id. "Coercion" is defined as the use of physical or moral force to compel another to act or assent to action. Swanset Development Corp. v. Taunton, 423 Mass. 390, 396 (1996).

itself coercive. <u>Pheasant Ridge Associated L.P. v. Town of Burlington,</u> 399 Mass. 771, 781 (1987).

In this case, Mr. Galvin was never threatened, intimidated, or coerced. Mr. Galvin only claims that a private party, not named as a defendant, was trying to create problems for him and that the defendants were fulfilling the wishes of that person. Tab 2, pp. 290-291.  Even supposing that the allegation were true, that the defendants were puppets of a private citizen who "intended to cause and caused a deprivation of Plaintiff's property interests," then the alleged deprivation would only be a direct act, not a threat or coercion. Tab 1, ¶ 27.  Thus, absent his bare assertions, the plaintiff has failed to show that Lt. Xiarhos disclosed information intended to coerce Galvin to some action.  For all the reasons above the MCRA action cannot stand.

> D.    <u>The doctrine of qualified immunity shields Lt. Xiarhos from any potential liability.</u>

Even if the plaintiff could make out a violation of his rights, public officials are entitled to qualified immunity in both federal and state civil rights actions.[6]  Immunity is provided to government officials who, while performing discretionary functions, could have reasonably thought their actions were consistent with the rights they are alleged to have violated. <u>Anderson v. Creighton</u>, 483 U.S. 635, 638, 107 S.Ct. 3034 (1986).  In enacting the Massachusetts Civil Rights Act, the state legislature also adopted federal qualified immunity

---

[6] It is assumed that Lt. Xiarhos and Chief Carnes are being sued in their individual capacities, based on the factors announced in <u>Powell v. Alexander</u>, 391 F.3d 1, 22-24 (1st Cir. 2004), even though the Plaintiff has not made this specific allegation.  In that Chief Carnes has not been shown to have done anything, discussion of his immunity is implied by the fact that there is no claim against him.

law. Duarte v. Healy, 405 Mass. 43, 46 (1989). Therefore, qualified immunity is available to the defendants for both the federal and state civil rights claims.

To determine whether qualified immunity is applicable, this Court must weigh the objective reasonableness of the official's conduct and determine whether it violated clearly established constitutional rights. Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 2738 (1982). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. at 640, 107 S.Ct. at 3039. Inquiry must turn on whether the defendant reasonably should have understood that his actions, as opposed to any motivation ascribed to him by the plaintiff, violated a clearly established constitutional right. Id.; see also Unwin v. Campbell, 863 F.2d 124, 137 (1st Cir. 1988).

As previously argued, a violation of clearly established statutory or constitutional rights did not occur.  First, the plaintiff has failed to specify an actual violation of state or federal law and has not demonstrated that any such violation occurred. Second, existing law supports the conclusion that disclosure was permitted, especially where public policy favors the officers' actions. G.L. c. 111B §8; Mass.Atty.Gen.Op. p. 43 (July 17, 1973); G.L. c. 71 § 38R; Conn. Gen. Stat. § 10-221d(a); French v. United Parcel Service, Inc., 2 F.Supp.2d at 131; Bellin v. Kelley, 435 Mass. at 262. Absent a clearly established right that an officer would have reasonably understood to preclude the dissemination of relevant information to a public school, qualified immunity applies and bars the civil rights claims against both Lt. Xiarhos and Chief Carnes.

E.    As a matter of law, the plaintiff's claims against the Town and Chief
      Carnes cannot survive a motion to dismiss.

The MCRA claim against the Town of Yarmouth should be dismissed

because it is not a cognizable claim under any set of facts. "A municipality is not

a 'person' within the meaning of the MCRA." LeBeau v. Town of Spencer, 167

F.Supp.2d 449, 455 (D.Mass. 2001),

The § 1983 claim against the Town should be dismissed because the

plaintiff has failed to provide any evidence that Lt. Xiarhos improperly disclosed

information to the Waterbury Public Schools as a result of a town policy or

custom. For municipal liability to attach under § 1983, the plaintiff must prove

that the municipality itself caused the constitutional violation at issue; vicarious

liability does not attach under § 1983. City of Canton, Ohio v. Harris, 489 U.S.

378, 109 S.Ct. 1197, 1203 (1989). Therefore, the plaintiff must show that a policy

or custom of the Town led to the alleged deprivation of rights. Monell v. New

York City Dept. of Social Services, 436 U.S. 658, 694-695, 98 S.Ct. 2018 (1978).

This requires the plaintiff to show the existence of a policy or custom and a

causal link between that policy and the constitutional harm. See City of Canton,

Ohio v. Harris, 489 U.S. at 385. Since Mr. Galvin has not made any allegation

that the information was disclosed to the Waterbury Public Schools as a result of

a town policy or custom, and he cannot prove such a policy or custom was in

existence, the § 1983 claim against Yarmouth should be dismissed.

If the claims are brought against the officers in their official capacities,

"Naming a government official in his official capacity is the equivalent of naming

the government entity itself as the defendant, and requires the plaintiff to make

out a Monell-type proof of an official policy or custom as the cause of the

constitutional violation." Karen M. Blum and Kathryn R. Urboyna, Section 1983
Litigation, 56, Federal Judiciary Center (1998); see also Brandon v. Holt, 469 U.S.
464, 471-72, 105 S.Ct. 873 (1985); Kentucky v. Graham, 473 U.S. 159, 159, 105 S.Ct.
3099 (1985). Therefore, any official capacity claims should be dismissed for the
same reason that the § 1983 claim against the Town of Yarmouth should be
dismissed.

Additionally, although Peter Carnes, the Chief of the Yarmouth Police,
and the Town itself are listed as defendants, the plaintiff never states a claim or
proffers any evidence against them.[7] Tab 1, ¶ 4. Absent any claim or evidence,
all claims against Carnes and the Town should be dismissed.

F.     The plaintiff's claim of tortious interference with contractual
       relations must fail as a matter of law because there was no harm.

To succeed on a claim for tortious interference with contractual relations, a
plaintiff must prove that "(1) [he] had an advantageous employment relationship
with [his] employer; (2) the defendant knowingly induced the employer to break
that relationship; (3) the defendant's interference, in addition to being
intentional, was improper in motive or means; and (4) the employee was harmed
by the defendant's actions." Luciano v. Coca-Cola Enterprises, Inc., 307
F.Supp.2d 308, 323 (D.Mass. 2004)(quoting Weber v. Community Teamwork,
Inc., 434 Mass. 761, 781 (2001)). It is important to note that "[s]omething more
than intentional interference is required to make out the tort...the additional
ingredient is improper conduct." Id. (internal quotations and punctuation
omitted). Although there was a contractual relationship between Mr. Galvin and

---

[7] The plaintiff did not depose any witness or party.

the Waterbury Schools, he has failed to show that any defendant knowingly and improperly interfered with this contract, or that there were any damages.

Lt. Xiarhos did not cause Mr. Galvin to be transferred. The transfer was caused solely by Galvin's failures in managing the worst high school in New England. The transfer occurred nine months after the Waterbury Public Schools learned of Mr. Galvin's stay in protective custody, but four days after the announcement that his school had failed all accreditation standards. Tab 3; Tab 7. The Superintendent of Schools, Dr. Snead, states in definitive terms that he transferred Mr. Galvin because Wilby High School lost its accreditation and not because of the protective custody incident. Tab 9, p. 2; Tab 4, p. 64.

In addition Mr. Galvin's contractual relationship was not broken, and he suffered no cognizable damages. He was transferred to a new job as Head of Adult Education where his salary and title remained the same. Tab 2, 228-232. For all of the above reasons, the claim of tortious interference with contractual relations must fail.

G.    The plaintiff's claims of intentional and negligent infliction of emotional distress must fail.

To prevail in any claim of infliction of emotional distress, Galvin must prove that he suffered physical manifestations of that distress that were somehow connected to the defendants' acts.

The required physical manifestation need not be severe. A plaintiff must only "corroborate their mental distress claims with enough objective evidence of harm to convince a judge that their claims present a sufficient likelihood of genuineness to go to trial." Sullivan v. Boston Gas Co., 414 Mass. 129, 137-138 (1993). In Sullivan, the plaintiff supported his claim with an affidavit signed by a

doctor, a record of psychological consultation evidencing problems reading and concentrating, and stated in his answers to interrogatories and deposition that he had trouble sleeping, had gastrointestinal troubles, was depressed, and felt "lousy." Id. at 131. This rather low level of evidence was held sufficient to survive summary judgment. Id. at 139.

Another key element of both negligent and intentional infliction of emotional distress claims is that the defendant has caused the emotional distress. See Conley v. Romeri, 60 Mass.App.Ct. 799, 803 (2004)(intentional infliction of emotional distress); Gutierrez v. Massachusetts Bay Transportation Authority, 437 Mass. 396, 412 (2002)(negligent infliction of emotional distress). In this case the plaintiff cannot prove that the defendants were responsible for causing any emotional distress. Mr. Galvin only claims that his blood pressure increased and that on an unknown date he had an emergency room visit for feeling strange. Tab 2, pp. 224-227. This is not enough for a claim of emotional distress, absent some supporting medical evidence that connects the defendants' acts to the plaintiff's medical condition. A plaintiff "must do more than allege mere upset, dismay, humiliation, grief and anger." Gutierrez v. Massachusetts Bay Transportation Authority, 437 Mass. at 412 (internal quotation omitted). Mr. Galvin has not even told his treating physician about the protective custody, release of information by Lt. Xiarhos, or that he believes these incidents raised his blood pressure. Tab 2, pp. 224-227. In fact, Mr. Galvin has never been told by a doctor that there was a connection between the actions of the Yarmouth Police Department and his blood pressure. Id. As should be clear from the facts of this case, Mr. Galvin is primarily embarrassed that he was transferred from his job as principal of Wilby High School for a major public failure. The humiliation and

21

anger deriving from this transfer does not meet the necessary legal elements required by Massachusetts law, absent objective symptoms with some medical corroboration.

The actions of Lieutenant Xiarhos certainly do not fall within the bounds of "extreme and outrageous" or "utterly intolerable." Mr. Galvin has failed to show that there was any intent on the part of any defendant to cause emotional distress, or that their actions would foreseeably cause mental harm. Mr. Galvin cannot even prove that any defendant acted in a negligent manner or with a specific intent to harm him. In sum, the claim for intentional or negligent infliction of emotional distress lack basis and must fail.

IV.    CONCLUSION

For the reasons set forth in this memorandum of law, no genuine issues of material fact exist and the defendants are entitled to a judgment as a matter of law.

Respectfully submitted,

Defendants,
By their attorneys,


        /s/Thomas P. Campbell
Thomas P. Campbell, BBO No.: 564124
Brody, Hardoon, Perkins & Kesten, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100


With:  Mark Boivin, Law Clerk

Dated: March 30, 2006

## REQUEST FOR ORAL ARGUMENT

The defendants request a hearing on this motion, pursuant to Local Rule 7.1(D), on the ground that oral argument may assist the Court in rendering its decision.

## LOCAL RULE 7.1(A)(2) CERTIFICATION

I hereby certify that on March 7, 2006, I wrote a letter to counsel for the plaintiff explaining my intent to file this motion, and referenced several of the arguments for doing so. Counsel for the plaintiff did not respond. In my view I have attempted in good faith to resolve or narrow the issues raised in this motion.

  /s/ Thomas P. Campbell
Thomas P. Campbell