**ORIGINAL**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-11958-RGS

*************************************
MARTIN J. GALVIN, JR. ED.D,                    )
       Plaintiff;                          )
                               )
     vs.                                    )
                               )
THE TOWN OF YARMOUTH,                          )
PETER L. CARNES AND STEVEN XIARHOS,            )
       Defendants.                         )
*************************************

DEPOSITION OF MARTIN J. GALVIN, a

witness called on behalf of the Defendant,

pursuant to the provisions of Rule 30 of the

Massachusetts Rules of Civil Procedure,

before Meredith A. Fairbanks, a Notary Public

and Shorthand Reporter in and for the

Commonwealth of Massachusetts, at the offices

of Brody, Hardoon, Perkins & Kesten, One

Exeter Plaza, Boston, Massachusetts 02116, on

Friday, November 4, 2005, commencing at 10:25

a.m.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**
**One State Street**
**Boston, Massachusetts 02109**
**Telephone (617) 742-6900**

1              level.

2      Q.     And then when the regular supervisor was able

3              to return to work, you went back to your job?

4      A.     Yes.

5      Q.     When did you leave the West Haven schools?

6      A.     '73.

7      Q.     Where did you go?

8      A.     Waterbury.

9      Q.     Now, we've just covered your employment

10             between 1968 and 1973.  During that time

11             frame, were you in school?

12     A.     Yes.

13     Q.     Tell me what you did with respect to your own

14             schooling?

15     A.     Well, I was in, I got my master's during that

16             time frame and I was working on a sixth year

17             in administration and supervision.

18     Q.     Let me ask you about your master's first.

19             Where did you get your master's degree?

20     A.     Southern.  Same school.

21     Q.     And what was it in?

22     A.     Teaching English.

23     Q.     What year did you achieve the degree?

24     A.     It had to be around '71-'72.  In that area.

1    Q.    Can you explain that?

2    A.    It's three credits beyond the master's.  In

3          the state of Connecticut, you have to have

4          that to be an administrator.  Once you

5          achieve 15 credit hours and you're in a

6          sixth-year program, you can get a certificate

7          for becoming an administrator.

8    Q.    So your goal was to become an administrator?

9    A.    Correct.

10   Q.    And did you go into that certification

11         program immediately after finishing the

12         master's?

13   A.    Yes.

14   Q.    Do you know when you achieved it?

15   A.    I graduated, I believe, with the sixth-year

16         degree, it could have been at the end of '73

17         or '74.  I was employed in Waterbury at that

18         point.

19   Q.    And this isn't, technically, it's not a

20         degree.  It's more of a certification that

21         you use that the public school systems or the

22         state requires in order to move you up?

23   A.    Yeah.  But it's also a degree.  In the field

24         of education, they call it sixth-year

```
 1          professional degree.

 2    Q.    Really?

 3    A.    Yeah.  I don't know if it's the same in

 4          Massachusetts, but that's what it is in

 5          Connecticut.

 6    Q.    What was the school that you went to for

 7          that?

 8    A.    Southern.

 9    Q.    Southern Connecticut again?

10    A.    Yes.

11    Q.    What was your first job with the Waterbury

12          Public Schools?

13    A.    Supervisor of Special Ed.

14    Q.    And that was a job that you needed to have

15          your provisional sixth-year certification

16          for?

17    A.    Right.  I have the 15 credits.

18    Q.    Did this job involve any teaching?

19    A.    No, it did not.

20    Q.    So what were your duties?

21    A.    Well, I was assigned -- Waterbury is a large

22          district.  At that point, it was probably

23          14,000 kids.  I was assigned X amount of --

24          there was three supervisors, so you divided
```

1   that went from preschool, actually, right

2   through grade 12.  We had preschool on

3   premise.

4       And I also had part of the alphabet.  The

5   alphabet of the student body would be divided

6   up into thirds and that was my discipline

7   responsibilities.

8   Q.   Okay.  Did you like that job?

9   A.   Yes.

10  Q.   And how long did you stay in it?

11  A.   Three years.

12  Q.   What happened in 1993?

13  A.   '93 the principalship of two high schools

14      became vacant due to retirements, so I threw

15      my hat into that and they appointed me high

16      school principal and assigned me to Wilby

17      High School.

18  Q.   Who is responsible for deciding who becomes

19      the principal, the superintendent or the

20      Board of Education?

21  A.   Both.

22  Q.   Superintendent selects somebody and then the

23      Board of Education has veto power.  Is that

24      how it works?

1          you probably could not see someone here.

2    Q.   Okay.

3    A.   Unless you were standing on this side of the

4         house (indicating).

5    Q.   Did anyone come over?

6    A.   Yes.

7    Q.   Who came over?

8    A.   Bobby, Alfie, Alfie's father-in-law.

9    Q.   What's Alfie's father-in-law's name?

10   A.   I don't know.

11   Q.   Don't remember?

12   A.   I don't remember.

13   Q.   Okay.

14   A.   Yeah.  They were trying to calm the thing

15        down.

16   Q.   Basically, break it up?

17   A.   Yeah.  Which they eventually did.

18   Q.   What did they say to you?

19   A.   They just told me forget about it.  Let it

20        go.  You know.  And, eventually, I calmed

21        down and continued to walk into the back.

22   Q.   Towards the Chamber house?

23   A.   Right.

24   Q.   What's your best memory of how long you were

1    A.    Okay?

2    Q.    That then answers my question.  Speaking of

3          waiting to see it in the newspaper, did you

4          ever see any report in any newspaper that had

5          anything to do with this Yarmouth Police

6          incident?

7    A.    Did I?  No.

8    Q.    Are you aware of any discussion of this in

9          any newspaper?

10   A.    I don't always read the -- at that point, the

11         internet, it wasn't as good as it is now.  So

12         I don't have access to the Yarmouth paper, so

13         I don't know what was in the Yarmouth paper.

14         Okay?  And I never saw anything personally in

15         the Waterbury paper.

16   Q.    Are you aware, do you have any information

17         that any newspaper ever published any

18         information about this incident?

19   A.    No.

20   Q.    Do you have any information that any

21         television or radio outlet ever disseminated

22         the information?

23   A.    Not to my knowledge.

24   Q.    Was it ever posted on the internet, as far as

1        you know?

2   A.   I have no idea.

3   Q.   So as far as you know, this information was

4        never broadcast in any journalism, press,

5        media format to the public at large; correct?

6   A.   I have never personally seen it, no.

7   Q.   And you don't have any other information that

8        it happened, do you?

9   A.   No.  But I, you can put two and two together

10       what's going on here.

11   Q.   Well, what I'm trying to get at is whether

12       you have any information whatsoever from any

13       source that the Yarmouth Police incident was

14       ever publicized?

15   A.   It was publicized because it was sent to a

16       non-police officer.

17   Q.   That was a bad question.

18   A.   With, with this statement on it.

19   Q.   Okay.  That was a bad question.  I'll ask a

20       different question.  Do you have any

21       information from any source whatsoever that

22       the Yarmouth Police incident information was

23       ever broadcast through any medium whatsoever?

24   A.   No.

1    Q.    Print, radio, television, internet, anything

2          else?

3    A.    Through a media service?  No.

4    Q.    Okay.

5              MR. ZAYOTTI:  I'm sorry, can I just

6          clarify, did you say media or medium?

7              MR. CAMPBELL:  Medium.

8    A.    Oh, medium?  Do I have any knowledge?

9    Q.    (By Mr. Campbell)  Yes.  That's my question.

10   A.    Right here (indicating).

11   Q.    I mean --

12   A.    There's a medium of a political-appointed

13         aide.  There's the medium of Mr. Mahaney, an

14         attorney, and Superintendent of Schools,

15         Assistant Superintendent of Schools, two

16         other attorneys, John Gesmonde and Mrs.

17         Cheney.  I don't know how many people saw it.

18   Q.    Okay.

19   A.    I don't know if board members saw it.  I

20         suspect they did.

21   Q.    I think I understand.  When is the first time

22         that you heard that that information had been

23         sent out to Frank Lombardo or anyone else?

24   A.    Again, I wish I had a calendar.  I don't know

1    A.    Yes.

2    Q.    You list James Uberti.  He's your primary

3          care physician?

4    A.    Correct.

5    Q.    What information does he have?

6    A.    Well, he reads newspapers.  He was very well

7          aware of the transfer.  As far as this

8          particular incident, I don't think he has any

9          knowledge of that, that I know of.  He may.

10         He just knows, knows me.

11   Q.    Did he ever provide you with any medical

12         treatment that arose out of any of the

13         allegations you're making in your complaint?

14   A.    Well, I, prior to the incident and this

15         whole, there was a lot of things going on;

16         divorce, the accreditation, this thing.  I

17         had no physical problems other than knee

18         problem that had been since I was 20 years of

19         age.

20             At that point, he was very concerned with

21         my blood pressure was up.  The history of my

22         family is heart attacks.  He knew I was under

23         a lot of pressure and that's where his

24         interest comes in.

1    Q.    Has Dr. Uberti ever told you that you have

2          any medical condition that's related to what

3          Yarmouth Police did?

4               MR. ZAYOTTI:  Objection.

5    A.    I already said he does not have knowledge, to

6          my knowledge, of that incident.  No.

7    Q.    (By Mr. Campbell)  He doesn't have any

8          knowledge of what happened in Yarmouth on

9          July 4th?

10   A.    I don't believe so.  I never asked him.

11   Q.    So his knowledge is of what, your medical

12         condition in the months after this incident

13         took place?

14   A.    Correct.

15   Q.    Okay.  And he would say that you were under

16         stress, and your blood pressure was high?

17   A.    Yes.  It was obvious all this going on at

18         once was having an effect.  I even had an

19         event where I spent the afternoon in the

20         emergency room.

21   Q.    When was that?

22   A.    That was right around the same time, time

23         frame.

24   Q.    Of July '01 or April '02?

```
1    A.    I would say it was in, in the fall of that

2          year.  I, again, would have to get the

3          records to make sure I'm giving you the right

4          date.

5    Q.    What was the name of the hospital?

6    A.    St. Mary's Hospital.

7    Q.    Where is that?

8    A.    Waterbury.  It was a Friday afternoon.

9    Q.    What did you have?  Was it an anxiety attack

10         or something?

11   A.    Well, they put a monitor on me.  My heart was

12         going a little crazy.  I was light-headed.  I

13         was at school.

14   Q.    Were you at the Wilby school when this

15         happened?

16   A.    Yes.  School nurse got very concerned because

17         I, I was just bouncing off of walls.  I mean,

18         I couldn't walk straight and I felt, felt

19         very strange.

20   Q.    What did the doctors tell you had happened to

21         you?

22   A.    They termed it an event.  They didn't say it

23         was a stroke, small stroke, anything like

24         that.  They just said, "You had an event.  We
```

1      can't explain it."

2   Q.  Let me ask you a more general question.  In

3      this case, are you saying that you've

4      suffered any physical manifestations of

5      injury arising from what the Yarmouth Police

6      did?

7   A.  Am I saying any physical?

8   Q.  Yes.

9   A.  I would attribute the increase in my blood

10      pressure.

11   Q.  Okay.  Has any doctor ever made the

12      connection between those two things, your

13      blood pressure and the Yarmouth Police?

14   A.  No.

15   Q.  I want to ask you about another question

16      regarding your damages.  You say in the

17      automatic disclosures that Mr. Zayotti gave

18      me, there's a computation of damages that

19      Mr. Zayotti put together, which I'll show to

20      you.  Do you see Paragraph C here it sets

21      forth damages that you've suffered and the

22      first category is "Loss of Future Earnings

23      and Benefits:  $100,000"?

24   A.  Mm-hmmm.

228

1    Q.    Up to this time, you haven't lost any
2          earnings at all, have you?
3    A.    No.
4    Q.    Your income hasn't changed for the worse
5          anyway; correct?
6    A.    Right.
7    Q.    Have you gotten any raises since 2001?
8    A.    It's contractual raises.  One and a half
9          percent.
10   Q.    Every year?
11   A.    No.
12   Q.    Every three years?
13   A.    This was the first year.
14   Q.    New contract so you got a one and a half
15         percent raise?
16   A.    No.  It's the end of an old contract.
17   Q.    Well, in the future, what loss of income do
18         you expect to experience?
19   A.    Well, obviously, I couldn't go and apply for
20         other positions without having this hanging
21         over my head.  I didn't know how far it went
22         and who had copies, you know, and who is
23         going to produce a copy for a future
24         employer.



1          everyone's salary as some suburban towns do.

2          They don't do that in urban school districts

3          that I've ever seen.

4     Q.   Okay.

5     A.   So I have no means of making comparison.

6     Q.   All right.  With respect to your divorce, you

7          allege that your wife got a more favorable

8          divorce decree than she would have if she had

9          not been aware of the Yarmouth Police report;

10         correct?

11    A.   Right.

12    Q.   Did the judge say that?

13    A.   Did the judge say it?  To me?  No.

14    Q.   Did he say it to anyone?

15    A.   I don't know.

16    Q.   What was the day that you were divorced?

17    A.   The final day was August 2002, I believe.  I

18         was served in March of 2001 before the

19         accreditation process, if I remember

20         correctly.

21    Q.   On the computer we printed off a copy of the

22         docket for your divorce.  It's Cynthia A.

23         Galvin vs. Martin J. Galvin and this document

24         says that on July 20th of '01 a judgement of

1         dissolution of marriage, judicial decision

2         required after full finding and hearing.  Do

3         you see that?

4    A.   Okay.  Yes.

5    Q.   Is that the day that Judge Patroni issued the

6         decree?

7    A.   That was the final date.

8    Q.   Okay.  That's July 20th and you were arrested

9         on July 4th; correct?

10   A.   Correct.

11   Q.   Did this report get introduced into evidence

12        at any hearing or any court proceeding of

13        your divorce?

14   A.   You could ask Mr. Potash, my attorney, how it

15        was presented.

16   Q.   You don't know if it was introduced into

17        evidence?

18   A.   It was threatened over my head by Mr. Mahaney

19        in the presence of the judge.  Now, whether

20        he ever entered it into evidence, again, I

21        can't tell you that.  Okay?

22   Q.   What did Mr. Mahaney do specifically?

23   A.   Well, he was trying to establish that I was a

24        bad guy, obviously.  That's what goes on in

```
 1              divorce.  And he was using it as, Here he
 2              goes again, another incident.
 3        Q.    So it was discussed openly during the divorce
 4              proceedings?
 5        A.    The Yarmouth incident?
 6        Q.    Yes.
 7        A.    He asked me questions about it, yes.  If I
 8              had recently got into a problem.
 9        Q.    Okay.  In fact, he asked you if you'd been
10              arrested recently, didn't he?
11        A.    I don't remember specifically.
12        Q.    And you hadn't recently been arrested;
13              correct?
14                  MR. ZAYOTTI:  Objection.
15        A.    I agree with your statement.
16        Q.    (By Mr. Campbell)  It would be fair to say
17              then that if he asked you at one of the
18              divorce proceedings if you had recently been
19              arrested, you'd probably say no; correct?
20                  MR. ZAYOTTI:  Objection.
21        A.    On that particular answer, yes.
22        Q.    (By Mr. Campbell)  And because, as far as you
23              know, this whole thing that Yarmouth Police
24              did does not constitute a formal arrest,
```

1    A.    I disagree with your statement there is no

2           way he knew about it.

3    Q.    (By Mr. Campbell)  Well, what I'm saying

4           is -- that was a bad question.  You're right.

5           The final decree of divorce was entered on

6           July 20, 2001; correct?

7    A.    Correct.

8    Q.    And at that time the arrangements pertaining

9           to the division of your property and assets

10         and the alimony and everything else was

11         decided; correct?

12    A.    Correct.

13    Q.    So and the arrest was on July 4th; correct?

14    A.    The, not arrest, whatever you're calling it.

15    Q.    The Yarmouth Police incident?

16    A.    It was July 4th, yes.

17    Q.    You're right.  Did the judge, Judge Patroni,

18         ever mention the arrest or the incident or

19         the protective custody detention?

20    A.    Not to my knowledge.

21    Q.    Was there ever anything in writing that you

22         saw in connection with the divorce that

23         referred to it?

24    A.    Mr. Mahaney's letter to Mr. Potash.

240

1    Q.    Was that letter given to the judge?

2    A.    I don't know.

3    Q.    What evidence do you have then that this

4          incident resulted in a more favorable decree

5          for your wife?

6    A.    Well, what was going on -- what evidence do I

7          have?

8    Q.    Yes.

9    A.    You'd have to ask the judge that or, you

10         know, what was presented between the 4th and

11         the 20th.

12   Q.    Well, are you going to call Judge Patroni as

13         a witness in this case?

14   A.    I don't know if he's still alive.

15   Q.    Are you going to call Mr. Potash as a witness

16         in this case?

17   A.    I don't know.

18         MR. ZAYOTTI:  Objection.  I mean, he

19         can't answer that question.

20   A.    Did we list it?  I don't know.

21   Q.    (By Mr. Campbell)  Who else other than Judge

22         Patroni and Attorney Potash would have the

23         ability to say that Cindy Galvin got a better

24         divorce as a result of the Yarmouth Police

1          actions?

2     A.   It's an opinionated question.  Anyone could

3          say that.

4     Q.   Okay.  Well, the judge, when he issued the

5          divorce, stated that he held you primarily

6          responsible for the breakdown of the

7          marriage; correct?

8     A.   Correct.

9     Q.   And when he did that, he didn't say anything

10         about the recent incident in the Town of

11         Yarmouth, did he?

12    A.   I don't know.

13    Q.   Well, did you ever read the judge's

14         statements at the hearing?

15    A.   I never read the decree, no.

16              MR. CAMPBELL:  Well, your attorney gave

17         it to me and we can mark it.

18            (The stenographer marked the document

19         Exhibit No. 11 for identification.)

20    Q.   (By Mr. Campbell)  The judge made a finding,

21         "The court believed the wife's testimony and

22         found it clear and convincing that the

23         defendant's behavior was the primary cause of

24         the breakdown."  Does that refresh your

242

1           memory?

2    A.     As I said to you, I didn't read that.

3    Q.     You were in the courtroom when he announced

4           his decision; correct?

5    A.     Well, what I heard was that --

6               MR. ZAYOTTI:  Objection.

7    A.     -- I was blamed for the divorce.

8    Q.     (By Mr. Campbell)  Your wife, it says here

9           she described three marital affairs that he

10          had.  First one 15 years ago and the second

11          ten years ago, but the third one was

12          currently, approximately two years ago, with

13          a person that worked with the Board of

14          Education.  Is this accurate?  Did you have

15          these three affairs?

16   A.     The last one is accurate.

17   Q.     Okay.  That's the one with Ms. Corideo?

18   A.     Correct.

19   Q.     What is her job at the Board of Education?

20   A.     She's retired.  She was an English teacher.

21   Q.     In what school?

22   A.     Wilby.

23   Q.     Is that how you met her, because you worked

24          at Wilby also?

1    claimed exhibited, you know, excessive use of

2    alcohol?

3  A.  Right.  She claimed certain things.  Again,

4    unsubstantiated.  You know.

5  Q.  She's talking about private incidents?

6  A.  Yeah.  I would say so, yeah.

7  Q.  She's not talking about incidents that

8    resulted in the police being involved;

9    correct?

10  A.  Well, I'm sure she was talking about those,

11    that incident.  Whether she made an actual

12    referral, no, I'm not saying to the July 4th.

13  Q.  Okay.

14  A.  Okay?  But whether she actually pinpointed

15    dates and times and, you know, I don't think

16    so.  She was just making the allegations.

17  Q.  What were the allegations, specifically?

18  A.  That I was a no good S.O.B. who drank every

19    day of the week and didn't go to work.  You

20    know.  What am I going to say to that?

21    Again, you would have to ask her.

22  Q.  Well, I think it's a fair question.  I mean,

23    she apparently convinced the judge and he

24    found it clear and convincing, so these

1      incident.

2   Q.   Judge Patroni's divorce decree making a

3        fifty-fifty split of your pension is dated

4        July 20th and you've said, correct me if I'm

5        wrong, you said earlier that some agency or

6        board later split it in a way that was not

7        fifty-fifty; correct?

8   A.   You're an attorney.  I'm not.  Okay?  And

9        this became very confusing to me.  I thought

10       the decree was very clear, but whoever my

11       attorney and her attorney agreed upon using,

12       I guess it's required by law someone sits

13       down and actually does the figures.  You

14       know.  And that's, I mean, it's startling.  I

15       wish I was going to -- I would have retired.

16  Q.   Well, the judge announces from the bench the

17       result that you were shooting for with

18       respect to your pension.  Let's move on.

19         Is there anything else, any other aspect of

20       the divorce decree that you think was

21       unfavorably effected by the Yarmouth Police

22       incident report?

23  A.   Well, I think the whole thing was influenced.

24  Q.   Can you tell me with any specificity how you

1          were hurt by it?

2     A.   It's the same way you established your

3          opinion that you candidly stated.

4     Q.   So is it fair to say then that you don't have

5          any testimony or documentation that connects

6          the Yarmouth Police incident report with

7          anything in terms of the division of assets?

8     A.   Is it fair to say that?

9               MR. ZAYOTTI:  Objection.

10    A.   No, it's not fair to say.

11    Q.   (By Mr. Campbell)  What do you have in terms

12         of documentation that connects the two?

13    A.   Mahaney's letter.

14    Q.   Did Mahaney's letter go to the judge?

15    A.   I think you're going to have to ask

16         Mr. Mahaney that question.

17    Q.   Well, so you don't know then; correct?  You

18         don't know the answer to that question?

19    A.   I have no way of knowing that.

20    Q.   Did Judge Patroni ever mention the Yarmouth

21         Police incident report?

22    A.   I don't remember.

23    Q.   Have you ever seen any divorce court

24         documents, state documents, salary documents,

260

1       school payroll documents, that mention the

2       incident report?

3    A.   Have I ever seen?

4    Q.   Yes.

5    A.   No.

6    Q.   In fact, the only document -- in fact,

7       there's no document whatsoever connected with

8       your divorce file that makes a reference to

9       the incident report, is there?

10   A.   That's your opinion.

11   Q.   Well, have you ever seen one?  Are you aware

12      of one?

13   A.   I don't know every document in there.

14   Q.   Are you aware of a single document that

15      refers to the incident report?

16   A.   Mahaney's letter.

17   Q.   Okay.  Anything else?

18   A.   That I'm aware of?  Well, with the wide

19      circulation of the document with all

20      allegations, where it went, who saw it, you

21      know, that's one of the reasons why this is

22      coming here.

23   Q.   Okay.  Well, I think you've answered the

24      question.  With respect to the school and

1          area that's very opinionated on both sides,

2          I'm sure.

3     Q.   Well, I mean, I guess I don't need to go

4          through the rest of this decree then except

5          to ask you if, again, there's anything, any

6          one of the provisions of the decree that

7          you're alleging was specifically related to

8          the Yarmouth Police incident disclosure?

9     A.   I can't climb inside the judge's head.

10            (A break was taken at 4:36 p.m.)

11            MR. CAMPBELL:  Let's mark this.  This is

12         the, it's the judgement, the actual judgement

13         itself.

14            (The stenographer marked the document

15         Exhibit No. 12 for identification.)

16    Q.   (By Mr. Campbell)  We've now marked the

17         document that I've been referring to as

18         Exhibit 12.  It's the Dissolution of Marriage

19         Judgement-Uncontested.  Obviously, you did

20         contest some of the issues regarding the

21         division of your assets during this divorce;

22         correct?

23    A.   Correct.

24    Q.   In fact, that was the main issue, right?