Page 38

1                            I'm referring to Exhibit 6.

2    A.   I'm not sure whether he did or whether it

3         was given to my secretary at the time and

4         then given to me.  I do recall seeing it.

5         It may have been given to my administrative

6         assistant, what some folks refer to as a

7         head secretary.

8    Q.   But in any case, you became aware of it and

9         had a chance to review on your own some of

10        the pages contained within that document?

11   A.   Correct.

12   Q.   Let me ask you, Doctor, did you ever after

13        reviewing Exhibit 6 which says from -- the

14        fax cover sheet says from Chief Peter L.

15        Carnes/Lieutenant Xiarhos.

16                       As a result of receiving this

17        document, did you have any communication

18        with Chief Carnes or with Lieutenant

19        Xiarhos?

20   A.   I called Lieutenant Xiarhos to talk to him

21        about what was going to happen, and after

22        they had completed whatever they were going

23        to do, would they send me their final

24        report.

Page 39

```
 1   Q.   Were you interested in finding out whether

 2        any criminal charges would result from this

 3        incident?

 4   A.   Yes.

 5   Q.   What did you find out from Lieutenant

 6        Xiarhos with respect to that?

 7   A.   The charges were dropped.

 8   Q.   It was your understanding that there was no

 9        criminal matter pending with reference to

10        Mr. Galvin; correct?

11   A.   Correct.

12   Q.   And that's -- you ascertained that shortly

13        after you received this document?

14   A.   Correct.

15   Q.   Did you have any further discussions with

16        Lieutenant Xiarhos?

17   A.   No.

18   Q.   Did you have any discussions at all with

19        Chief Carnes?

20   A.   No.

21   Q.   Did you have any discussions with any other

22        officers of the Yarmouth police?

23   A.   No.

24   Q.   To confirm, you did back at that time see
```

Page 43

1   A.   Correct.

2   Q.   Is it fair to say that this letter, Exhibit

3        7, was the initial step that you were

4        taking to further investigate the matter

5        that had been raised in Exhibit 6; correct?

6   A.   Correct.

7   Q.   As a result of this letter dated July 10th,

8        Exhibit 7, did you have a meeting with

9        Dr. Galvin?

10  A.   I believe we did.

11                  (Recess:  11:12 a.m. to

12       11:24 a.m.)

13  BY MR. CAMPBELL:

14  Q.   Doctor, you ended up having a meeting with

15       Dr. Galvin to discuss this police report

16       and police documents that have been sent to

17       your office; correct?

18            MS. WELLER:  Objection to the form.

19  A.   I believe we did.

20  BY MR. CAMPBELL:

21  Q.   Do you recall any of the details of that

22       meeting?

23  A.   I vaguely recall that Dr. Galvin relayed

24       his point of view about what occurred and

```
 1        his reasons and rationale for whatever
 2        occurred, and I also vaguely recall at that
 3        time that I received information that the
 4        charges were dropped, and I think I simply
 5        advised Dr. Galvin that if any behavior of
 6        this sort should occur in the future and
 7        result in any kind of conviction, that it
 8        could impact negatively on his employment.
 9   Q.   Do you recall whether Frank Lombardo was
10        present at the meeting?
11   A.   I don't recall who was there.
12   Q.   Who is --
13   A.   It's possible he may have been.
14   Q.   Who is Attorney John Gesmonde?
15                  Let me ask you a different
16        question.
17                  Is he an attorney who
18        represented members of the school
19        administrators of the Waterbury union?
20   A.   I believe so.
21   Q.   Is it possible that he was present at the
22        meeting?
23   A.   It's possible.
24   Q.   There is a Mrs. C-h-i-n-n-i who was an
```

Page 64

```
 1          Trustees, NEASC was released in April of
 2          2002; isn't that correct?
 3     A.   Correct.
 4     Q.   And Wilby failed all seven portions of the
 5          accreditation process; correct?
 6     A.   Correct.
 7     Q.   What action did you take with respect to
 8          Dr. Galvin in response to that?
 9     A.   I removed Dr. Galvin from the principalship
10          of Wilby High School and transferred him to
11          the vacancy of principal at the adult
12          education center.
13     Q.   What were your reasons for making that
14          transfer, Doctor?
15     A.   There was a need for a change in leadership
16          at Wilby High School.
17     Q.   Were there any other reasons for that
18          transfer?
19     A.   No.
20     Q.   You made that determination.
21               Did you have to get approval
22          from the Board of Education to execute it?
23     A.   No.
24     Q.   It's completely within your discretion to
```

1    employee, do they have an obligation to

2    report that to the school department?

3         MS. WELLER:  If you know.

4  A.  No.

5    BY MR. CAMPBELL:

6  Q.  In this case with the July 4th incident,

7    did Dr. Galvin have an obligation to report

8    that incident to the school department?

9  A.  No.

10 Q.  When you -- going back to the meeting that

11   you had with Dr. Galvin after the July 4th

12   incident, the hearing if you will, you

13   stated earlier that you gave him some

14   verbal advice regarding possible

15   consequences of this type of behavior;

16   correct?

17 A.  Correct.

18 Q.  Did that advice constitute formal job

19   action of any kind?

20 A.  No.

21 Q.  Was the content of that advice or the fact

22   it was given entered into Dr. Galvin's

23   personnel file or any record of his?

24 A.  No.

Page 79

1    Q.   Did the -- was the verbal advice

2         disciplinary in any way?

3    A.   It was simply advice that any future

4         behavior like this that had occurred could

5         result in some kind of disciplinary action.

6              MR. CAMPBELL:   Thanks.   Off the

7         record.

8                   (Off-the-record discussion.)

9    BY MR. CAMPBELL:

10   Q.   I want to return, Doctor, to Frank

11        Lombardo.

12                  What role, if any, did Frank

13        Lombardo play in your action with respect

14        to the July 4th incident?

15   A.   Not much other than to relay the facts from

16        the Yarmouth Police Department that was

17        given to the Mayor's office to my office.

18        He could have done something else that I

19        don't recall, but I don't recall

20        specifically what it may have been.  It's

21        possible he could have called up there as

22        part of his role with the Mayor's office,

23        his association with the police department,

24        he may have called up there to get some