UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11958-RGS

---

MARTIN J. GALVIN, JR., ED.D.,

      Plaintiff,

vs.

THE TOWN OF YARMOUTH, PETER
L. CARNES AND STEVEN XIARHOS,

      Defendants.

---

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

The Plaintiff Martin J. Galvin, Jr., Ed.D. hereby submits this Memorandum

of Law in Support of his Motion for Summary Judgment.

### I. INTRODUCTION

This action arises out of the Defendants' wrongful dissemination of a police report

regarding an incident involving the Plaintiff to the Plaintiff's employer, the City of

Waterbury Public Schools, as a result of which the City of Waterbury Public Schools

terminated the Plaintiff from his position as Principal of Wilby High School, and

demoted and reassigned him to a position of employment as Principal of the Waterbury

Adult Continuing Education program. The Plaintiff asserts claims for wrongful

dissemination of Criminal Offender Records Information in violation of Mass. Gen. L.

ch. 6, §172 (Count I); violation of Plaintiff's civil rights under Mass. Gen. L. ch. 12, §§

11H and 11I and 42 U.S.C. § 1983 (Counts II and III); invasion of privacy (Count IV);

tortious interference with contractual relations (Count V) and intentional and negligent infliction of emotional distress (Counts VI and VII).

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

On July 4, 2001, the Plaintiff was involved in a verbal altercation with off-duty Yarmouth Police Officer, Louis Nickinello, Jr., during which the Plaintiff and Officer Nickinello swore at each other and traded insults. First Amended Complaint, at ¶ 8; Answer, at ¶ 8; Zayotti Affidavit, Exh. A, at 86-88. The incident arose out of hostilities between the Plaintiff on the one hand, and Officer Nickinello and his parents ("Mr. and Mrs. Nickinello") on the other hand, stemming from a dispute regarding Mr. and Mrs. Nickinello's failure and refusal to consummate an agreement to sell their home to the Plaintiff. Id. at 70, 82-88. In addition to having been denied the ability to purchase the home at issue, the Plaintiff lost a deposit in amount of $21,000, among other things. Id. at 153, 265-266.

This ugly dispute between the Plaintiff and Mr. and Mrs. Nickinello played out in several arenas, including but not limited to an action in superior court over the real estate transaction, and a subsequent summary process action brought by Mr. and Mrs. Nickinello against the Plaintiff for possession of the property in question, which the Plaintiff had theretofore been renting from Mr. and Mrs. Nickinello. Zayotti Affidavit, Exh. A, at 153, 297; Exh. B; and Exh. C.

Officer Nickinello and or the Yarmouth Police believed that the "animosity demonstrated by [the Plaintiff] stem[med] from a civil action over the property . . . between Mr. Galvin and Louis Nickinello Sr, that was settled in court in Mr. Nickinello's favor." Zayotti Affidavit, Exh. D.

2

Officer Nickinello called the Yarmouth Police who arrived at the Nickinello residence after the altercation was over and the Plaintiff had departed the scene to return to the residence he was renting one street over from the Nickinello residence. Zayotti Affidavit, Exh. E.  After speaking with Officer Nickinello, the Yarmouth Police then went to the Plaintiff's rental residence.  Id.  According to the arresting officer's report, the Plaintiff was highly intoxicated, but there is no indication that the Plaintiff was abusive, disorderly or belligerent at that point, or that the Plaintiff resisted when he was subsequently taken into custody. Id.  Further, the Plaintiff's mother and brother, who were not intoxicated, told the arresting officer that they would "take care of" the Plaintiff. Id.  Nevertheless, at approximately 8:00 p.m. the Yarmouth Police handcuffed the Plaintiff, took him into custody and took him to the Yarmouth Police station where he was held until the following day.  Id.

On July 5, 2001, at 9:00 a.m., the Yarmouth Police released the Plaintiff from custody.  Second Amended Complaint, at ¶ 10; Answer, at ¶ 10; Zayotti Affidavit, Exh. F.

On Monday, July 9, 2001, the Plaintiff returned to work in his position of employment with the Waterbury Public Schools, in Waterbury, Connecticut, as Principal of Wilby High School. Zayotti Affidavit, Exh. A, at 149.  To the Plaintiff's knowledge, the Plaintiff had no legal obligation to report the incident, or any criminal conviction for that matter, to his employer.  Id. at 221.

By letter dated July 10, 2001, the Plaintiff was informed by the Superintendent of Schools that the Yarmouth Police had notified the City of Waterbury of the incident on Friday, July 6, 2001.  In particular, the Superintendent of Schools stated as follows:

3

On Friday, July 6, 2001, I was notified that the Yarmouth, MA Police Department had arrested you for threatening and for malicious destruction/vandalism.

The Yarmouth police have reported to us that on or about 7:30 p.m. on July 4, 2001, you went to the home of a former neighbor, and made threats to him in front of his children aged 8 and 9. These threats included the use of abusive and profane language. It is further reported you were heavily intoxicated and that you vandalized property including a fence and patio chair.

As a result of this conduct, police were called and you were arrested and placed into protective custody. **Please be advised that these criminal charges, if true, result in questions relative to your employment in the Waterbury Public Schools.**

I would like to give you an opportunity to discuss this matter as soon as possible. Please contact me when you receive this letter to arrange a meeting. You are entitled to SAW [union] representation at this meeting if you so choose.

Zayotti Affidavit, Exh. G (emphasis supplied).

On or about July 12, 2001, the Plaintiff, a union lawyer and the president of the Plaintiff's union met with the Superintendent of Schools, the Personnel Director of Schools and the City of Waterbury's lawyer to discuss the Yarmouth incident. Zayotti Affidavit, Exh. A, at 150-152, 173, 196-197. During this meeting, the Plaintiff learned that Chief Peter L. Carnes, Lieutenant Steven Xiarhos and the Yarmouth Police Department had faxed to the City of Waterbury on July 6, 2001 an eight-page incident report regarding the Yarmouth incident. Id. Exh. A, at 146-148; and Exh. F.

During the meeting, the Plaintiff did not deny that the incident occurred, but he asserted that the Yarmouth Police had unlawfully disseminated the information to the City of Waterbury, and the lawyers for both sides agreed. Zayotti Affidavit, Exh. A, at 151, 162-163, 167

4

The Incident Report, which was stamped "Confidential" and "**\*\*\*FOR LAW ENFORCEMENT USE ONLY\*\*\***" (emphasis in original) stated, in relevant part, as follows:

> Martin J. Galvin Jr. has been harassing the Nickinellos family again. On Wed. 7/4/01 at 1930, Galvin went to Patrol Officer Nickinello's home and made threats and vandalized some property. Galvin was heavily intoxicated and was verbally abusing to both of Patrol Officer Nickinello's daughters.
>
> YPD responded and placed Galvin in protective custody.
>
> Galvin is an alcohol abuser with 2 previous OUI arrests by YPD.
>
> Please keep watch of the Nickinello property and be alert for Mr. Galvin.
>
> See report 2001014939 7/4/01 for additional details.
>
> Waterbury PD contacted. Galvin is Wilby High School principal in Waterbury.
>
> ### DESCRITPION OF SUBJECT
>
> **MARTIN J. GALVIN JR. WM AGE 56**
> **5-10 180 SALT/PEPPER HAIR AND BEARD**
> **21 Coniston Ave Waterbury, CT**
>
> Possible Local Address:
> Room 2 Riverview Annex SY
> 46 Eldredge Rd SY
>
> **Galvin has *no* active MA or CT driver license**
>
> **Galvin has active CT License to Carry**

Zayotti Affidavit, Exh. F (emphasis in original).

On or about April 26, 2002, the Plaintiff was terminated from his position of employment as Principal of Wilby High School, and the Plaintiff was involuntarily transferred to the position of Principal of Adult Education for the City of Waterbury.

Zayotti Affidavit, Exh. A, at 186-187, 197-198, 307. As a result of the involuntary transfer, the duties and responsibilities of Plaintiff's employment were diminished. Id. at 307-314.

On or about April 30, 2002, the Plaintiff filed a grievance against the City of Waterbury, challenging the legality of his involuntary transfer to the position of Principal of Adult Education for the City of Waterbury. Zayotti Affidavit, Exh. H.

By Memorandum dated May 20, 2002, the Superintendent of Schools responded to Plaintiff's request for a written statement of the reasons for the Plaintiff's involuntary transfer, wherein the Superintendent of schools stated that the transfer was in "the best interests of the school system". Further, the Superintendent of Schools stated that "[i]n light of the recent report of the New England Association of Schools, it has become evident . . . that a change in leadership was necessary at Wilby High School." Zayotti Affidavit, Exh. I.

As a result of the Defendants' dissemination of CORI to the City of Waterbury, the Plaintiff felt intimidated with respect to responding to the New England Association of Schools' negative accreditation report for fear that the Yarmouth incident would be brought out to the public. Zayotti Affidavit, Exh. A, at 323-324. Additionally, as a result of the dissemination of the Plaintiff's CORI to the City of Waterbury, the Plaintiff was "under a lot of pressure" and stress, his "blood pressure was up" and on one occasion he experienced some sort of anxiety attack that brought him to the emergency room at St. Mary's Hospital in Watebrury, Connecticut. Zayotti Affidavit, Exh. A, at 224-227.

Although two other Waterbury high schools received poor evaluations from the New England Association of Schools, the Plaintiff was the only Principal out of the three high schools to be involuntarily transferred. Zayotti Affidavit, Exh. A, at 185-187.

By Settlement Agreement dated June 11, 2003, the Plaintiff's grievance was settled. Zayotti Affidavit, Exh. H.

### III. ARGUMENT

### A.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Grub v. KMS Patriots, L.P., 88 F.3d 1, 3 (1st Cir. 1996), citing, Kelly v. United States, 924 F.2d 355, 357 (1st Cir. 1991); Fed. R. Civ. P. 56(c). Under this standard, "a party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists. Once the moving party has made this showing, the nonmoving party must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." Blackie v. State of Maine, 75 F.3d 716, 721 (1st Cir. 1996). To avoid summary judgment, the nonmoving party "must offer the court more than posturing and conclusory rhetoric. This principle is brought into bold relief when the motion targets an issue on which the nonmoving party bears the ultimate burden of proof." McIntosh v. Antonino, 71 F.3d 29, 33 (1st Cir. 1995). Finally, in ruling upon a motion for summary judgment, "[m]atters of law . . . are for the court to resolve." Blackie, 75 F.3d at 721.

**B.  THE DEFENDANTS WRONGFULLY DISSEMINATED CORI IN VIOLATION OF MASS. GEN. L CH. 6, § 172 BY FAXING THE INCIDENT REPORT TO PLAINTIFF'S EMPLOYER**

In disseminating the Incident Report to Plaintiff's employer City of Waterbury, the Defendants wrongfully disseminated Criminal Offender Records Information ("CORI") regarding the Plaintiff in violation of Mass. Gen. L. ch. 6, § 172.

CORI may be disseminated "only to (a) criminal justice agencies; (b) such other agencies and individuals required to have access to such information by statute . . .; and (c) any other agencies and individuals where it has been determined [by the Criminal History Systems Board], that the public interest in disseminating such information to these parties clearly outweighs the interest in security and privacy." Mass. Gen. L. ch. 6, § 172. See also, Police Com'r of Boston v. Municipal Court of Dorchester Dist., 374 Mass. 640, 646 n. 3 (1978). "For access under clause (c), the criminal history systems board (established by G.L. c. 6, § 168) (board) must first determine and certify by a two-thirds majority 'that the public interest in disseminating such information to such party clearly outweighs the interest in security and privacy.'" Bellin v. Kelley, 435 Mass. 261, 264 (2001), quoting, Mass. Gen. L. ch. 6, § 172. CORI is defined as "records and data in any communicable form compiled by a criminal justice agency which concern an identifiable individual and relate to the nature or disposition of a criminal charge, an arrest, a pre-trial proceeding, other judicial proceedings, sentencing, incarceration, rehabilitation, or release." Mass. Gen. L. ch. 6, § 167.

Although the Yarmouth Police characterized the Plaintiff's arrest as Protective Custody, the undisputed facts are inconsistent with the Protective Custody statute and warrant a finding that the Yarmouth Police arrested the Plaintiff. Pursuant to the Protective Custody statute, "[a]ny person who is incapacitated may be assisted by a

8

police officer with or without his consent to his residence, to a facility or to a police station. . . ." Mass. Gen. L. ch. 111B, § 8. Further, the Protective Custody statute expressly provides that "[n]o person assisted to a police station pursuant to this section shall be held in protective custody against his will; provided, however, that if suitable treatment at a facility is not available, an incapacitated person may be held in protective custody at a police station until he is no longer incapacitated or for a period of not longer than twelve hours, whichever is shorter." Id.

Contrary to the Protective Custody statute, the Yarmouth Police took the Plaintiff into custody from his residence, handcuffed him, refused to release the Plaintiff into the care and custody of his family, and held the Plaintiff against his will in excess of twelve hours. Zayotti Affidavit, Exh. E. Moreover, the undisputed facts establish that at the time the Yarmouth Police took the Plaintiff into custody, the Plaintiff was not "incapacitated" within the meaning of the Protective Custody statute. In that regard, the term "incapacitated" means "the condition of an intoxicated person who, by reason of the consumption of intoxicating liquor is (1) unconscious, (2) in need of medical attention, (3) likely to suffer or cause physical harm or damage property, or (4) disorderly." Mass. Gen. L. ch. 111B, § 3. When the Yarmouth Police took the Plaintiff into custody, he was not unconscious, did not need medical attention, was not disorderly, and there was no reasonable basis for the Yarmouth Police to conclude that the Plaintiff was likely to suffer or cause physical harm or damage property. Zayotti Affidavit, Exh. E. These undisputed facts, when taken together, require a finding that the Yarmouth Police had arrested the Plaintiff.

Additionally, the so-called Incident Synopsis that the Yarmouth Police faxed to the City of Waterbury, included information regarding prior arrests of the Plaintiff and the disposition of criminal matters, the circumstances and details of which had nothing to do with the incident that was supposedly the subject of the report and, therefore, should not have been included in a synopsis of the incident. Specifically, the Incident Synopsis states that "Galvin is an alcohol abuser with 2 previous OUI arrests by YPD." Zayotti Affidavit, Exh. F. Additionally, the Incident Report refers to the disposition of the OUI charges, stating that "**Galvin has *no* active MA or CT driver license**". Id. (emphasis in original). Finally, the Incident Synopsis refers to a supposed history of harassment, stating that "Martin J. Galvin Jr. has been harassing the Nickinello family again." Id. This information constituted "records and data in [a] communicable form compiled by a criminal justice agency which concern an identifiable individual and relate to the nature or disposition of a criminal charge, an arrest, a pre-trial proceeding, other judicial proceedings, sentencing, incarceration, rehabilitation, or release" and, therefore, constituted CORI within the meaning of Mass. Gen. L. ch. 6, § 167.

Moreover, the Plaintiff's employer, the City of Waterbury, Connecticut, is not an entity to which the dissemination of CORI is authorized under Mass. Gen. L. ch. 6, § 172 because the City of Waterbury does not qualify as a "criminal justice agencies," is not required to have access under some other statute, and did not obtain the requisite certification from the board under Mass. Gen. L. ch. 6, 172(c). Clearly, in enacting Mass. Gen. L. ch. 71, § 38R, which requires "the school committee and superintendent of any city, town or regional school district and the principal, . . . of a public or accredited private school of any city, town or regional school district [to] have access to . . . all

10

available criminal offender record information from the criminal history systems board of any current or prospective employee or volunteer of the school department, who may have direct and unmonitored contact with children, including any individual who regularly provides school related transportation to children" the Massachusetts Legislature did not contemplate, nor did it have authority to require, that the public school system of another state have access to Massachusetts CORI. Moreover, by its terms Mass. Gen. L. ch. 71, § 38R would not have applied to the Plaintiff in any event who, as Principal of Wilby High School, would not have had "direct and unmonitored contact with children".

By the same token, Conn. Gen. Stat. § 10-221(d)(a)(2) provides that the regional board of education "**may require**, subject to the provisions of subsection (d) of this section, any person hired prior to [July 1, 1994] to submit to state and national criminal history records checks . . ." and, therefore, did not require the City of Waterbury to have access to CORI regarding the Plaintiff. Conn. Gen. Stat. § 10-221(d)(a)(2) (emphasis supplied). In that regard, the Plaintiff understood that he had no legal obligation to report the incident, or any criminal conviction for that matter, to his employer. Zayotti Affidavit, Exh. A, at 221.[1] Finally, the Criminal History Systems Board has not, to Plaintiff's knowledge, certified the Waterbury Public Schools pursuant to Mass. Gen. L. ch. 6, § 172(c). Accordingly, the Defendants' dissemination of Plaintiff's CORI to the City of Waterbury was unlawful pursuant to Mass. Gen. L. ch. 6, § 172.

Finally, the conclusion is warranted that the dissemination of the Plaintiff's CORI motivated the Superintendent of Schools to involuntarily transfer the Plaintiff. Indeed,

---

[1] Notably, the Plaintiff's understanding in this regard is consistent with the testimony of the Superintendent of Schools.

the Superintendent of Schools stated to the Plaintiff by letter dated July 10, 2001 that the "criminal charges [reported by the Yarmouth Police], if true, result in questions relative to your employment in the Waterbury Public Schools." Zayotti Affidavit, Exh. G. When the Superintendent of Schools investigated the incident, the Plaintiff did not deny that the incident took place, but rather merely asserted that his CORI had been unlawfully disseminated to the City of Waterbury. The Superintendent of Schools' subsequent statement that the Plaintiff's involuntary transfer was in "the best interests of the school system", is not inconsistent with the conclusion that the decision of Superintendent of Schools was motivated, at least in part, by the CORI disseminated to him by the Yarmouth Police. Moreover, the fact that the Plaintiff was treated differently than the principals of two other Waterbury high schools that were also the subject poor evaluations rendered by the New England Association of Schools, is further support for the conclusion that the Plaintiff's CORI influenced the Superintendent of School's decision to terminate the Plaintiff as Principal of Wilby High School. Zayotti Affidavit, Exh. A, at 185-187. Finally, the fact that the Superintendent of Schools did not later acknowledge in his written statement that the Plaintiff's CORI played a part in his decision does not alter the appropriateness of the foregoing conclusion. In light of the fact that the Plaintiff had commenced a grievance challenging the legality of his involuntary transfer, and the fact the City of Waterbury's attorney agreed with the Plaintiff that the dissemination of Plaintiff's CORI was illegal, the Superintendent was not in any position to admit in writing that his decision to terminate the Plaintiff was motivated by the receipt of Plaintiff's CORI.

12

Accordingly, for the foregoing reasons the Plaintiff is entitled to judgment as a matter of law that the Defendants' wrongfully disseminated the Plaintiff's CORI.

## C.   THE DEFENDANTS VIOLATED PLAINTIFF'S CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AND MASS. GEN. L. CH. 12, §§ 11H AND 11I BY DISSEMINATING PLAINTIFF'S CORI TO PLAINTIFF'S EMPLOYER

The Defendants' unlawful dissemination of Plaintiff's CORI to the City of Waterbury violated the Plaintiff's civil rights and federal and state law.

To establish a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate "the existence of a federal constitutional or statutory right, and some deprivation of that federal right as a result of defendant's actions under color of state law." Watterson v. Page, 987 F.2d 1, 7 (1st Cir. 1993). Generally, "liability attaches only to those wrongdoers who carry a badge of authority of the State and represent it in some capacity, whether they act in accordance with their authority or misuse it." National Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 109 S.Ct. 454, 461-462, 102 L.Ed.2d 469 (1988).

The Massachusetts Civil Rights Act provides a remedy "[w]henever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth." Mass. Gen. L. ch. 12, §§ 11H and 11I. The word "threat" has been defined to mean the "exertion of pressure to make another fearful or apprehensive of injury or harm." Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. 467, 474, cert. denied, 513 U.S. 868, 115 S.Ct. 188, 130 L.Ed.2d 122 (1994). The term "intimidation" has been defined as "putting in fear for the purpose of

compelling or deterring conduct." Id. The term "coercion" means the "active

domination of another's will." Delaney v. Chief of Police of Wareham, 27 Mass. App.

Ct. 398, 409 (1989). As the Massachusetts Supreme Judicial Court has recently

explained, "coercion" under the Mass. Gen. L. ch. 12, §§ 11H and 11I is "not limited . . .

to actual or attempted physical force." Lecrenski Bros. Inc. v. Johnson, 312 F.Supp.2d

117, 122 (D.Mass. 2004), citing, Buster v. George W. Moore, Inc., 438 Mass. 635 (2003).

On the contrary, "in certain circumstances, economic coercion, standing alone, may be

actionable under the act." Lecrenski, 312 F.Supp.2d at 122, citing, Buster, 438 Mass. at

410 and 411 ("For example, we have suggested that coercion may be found where one

party deprives another of rights due under a contract.").

"[C]ancellation of an employment contract or future economic relationship is

sufficient to constitute coercion within the meaning of the MCRA. Vaughn v. XRE/ADC

Corp., 1996 WL 1185094, *3 (Mass.Super. 1996), citing, Karetnikova v. Trustees of

Emerson College, 725 F.Supp. 73, 77-78 (D.Mass.1989); Bally v. Northeastern

University, 403 Mass. 713, 719-20 (1989); Redgrave v. Boston Symphony Orchestra, 399

Mass. 93, 95 (1988). Thus, for example, in Karetnikova, this Court held that where a

university professor had alleged that she was denied tenure because of her conservative

speech and publications regarding political issues, the plaintiff sufficiently stated a claim

for relief under the Massachusetts Civil Rights Act. 725 F.Supp. at 77. Further, the

Court ruled that the plaintiff sufficiently alleged coercion of her First Amendment rights

by means of the cancellation of a future economic relationship. Id.

Similarly, in the present case, as a result of the Defendants' dissemination of

Plaintiff's CORI, the Plaintiff felt coerced and intimidated with respect to responding to

14

the New England Association of Schools' negative accreditation report and subsequent

criticism of Plaintiff's performance in his job as Principal of Wilby High School, as to

which the Plaintiff, as a public employee, had a protected property interest. See King v.

Town of Hanover, 116 F.3d 965, 969 (1st Cir. 1997) ("It is well established that a public

employee has a constitutionally protected property interest in his continued employment

when he reasonably expects that his employment will continue.") As such, the

Defendants interfered with Plaintiff's protected property interest in his continued

employment as Principal of Wilby High School, and coerced and intimidated the Plaintiff

in exercising his free speech rights for the purpose of defending his performance and

taking other steps to protect his property interest in his employment. Zayotti Affidavit,

Exh. A, at 323-324. Because the Defendants' actions were carried out under the color of

state law, there are no disputed issues of material fact and the Plaintiff is entitled to

judgment as a matter of law on his claims under both Mass. Gen. L. ch. 12, §§ 11H and

11I, and 42 U.S.C. § 1983.

**D.    THE DEFENDANTS INVADED THE PLAINTIFF'S PRIVACY IN**
**VIOLATION OF MASS. GEN. L. CH. 214, § 1B BY DISSEMINATING THE**
**PLAINTIFF'S CORI TO PLAINTIFF'S EMPLOYER**

The Defendants invaded the Plaintiff's privacy in violation of Mass. Gen. L. ch.

214, § 1B by disseminating the Plaintiff's CORI to the City of Waterbury.

Under Massachusetts law, "A person shall have the right against unreasonable,

substantial or serious interference with his privacy." Mass. Gen. L. ch. 214, § 1B. This

provision proscribes the disclosure of information about an individual that is of a "highly

intimate or personal nature." Bratt v. Intern. Business Machines Corp., 392 Mass. 508,

518 (1984). In determining whether the disclosure of information constitutes an invasion

of privacy, courts consider the degree of the intrusion. Generally, the disclosure of

information which is not "highly personal or intimate" is not an "unreasonable, substantial or serious" invasion of privacy and is not actionable. Id. at 520. However, it is well-settled that an unlawful invasion of privacy may arise where, as here, private or confidential information has been publicly disseminated. Bally v. Northeastern University, 403 Mass. 713, 720 (1989), citing, Cort v. Bristol-Myers Co., 385 Mass. 300, 307 n. 9 (1982); Hastings & Sons Publishing Co. v. City Treasurer of Lynn, 374 Mass. 812, 819 (1978) (disclosure of police payroll records); Commonwealth v. Wiseman, 356 Mass. 251, 258-262 (1969) (showing of film concerning conditions at Massachusetts Correctional Institution at Bridgewater); Attorney Gen. v. School Comm. of Northampton, 375 Mass. 127, 132 (1978) (disclosure of names of job applicants); Tower v. Hirschhorn, 397 Mass. 581, 588 (1986) (defendant doctor divulged confidential medical information about plaintiff without her consent); Bratt v. International Business Machs. Corp., 392 Mass. 508, 518 (1984) (stating that intracorporate communication constituted sufficient disclosure to violate § 1B).

Because Mass. Gen. L. ch. 6, § 172, governing the dissemination of CORI, prohibited the disclosure at issue as more fully discussed above, the Plaintiff had a reasonable expectation of privacy in his CORI, it was unreasonable for the Defendants to disseminate Plaintiff's CORI to his employer, and the Defendants' invasion of Plaintiff's privacy by means of their unlawful dissemination of Plaintiff's CORI was serious and substantial. Cf. Restuccia v. Burk, 1996 WL 1329386, *3 (Mass.Super. 1996) (summary judgment denied because genuine issues of material fact existed as to whether plaintiffs had a reasonable expectation of privacy in their E-Mail messages and whether Burk's reading of the E-Mail messages constituted an unreasonable, substantial or serious

interference with plaintiffs' privacy); <u>Whirty v. Lynch</u>, 27 Mass. App. Ct. 498, 501

(1989) ("As the assistant district attorney's dissemination of information about Whirty's

criminal record was permissible under CORI, it could hardly constitute an unreasonable

interference with his privacy within the meaning of G.L. c. 214, § 1B.").

### E.     THE DEFENDANTS INTERFERED WITH PLAINTIFF'S EMPLOYMENT RELATIONSHIP WITH THE CITY OF WATERBURY BY DISSEMINATING THE PLAINTIFF'S CORI

The Defendants toritiously interfered with the Plaintiff's employment relationship

with the City of Waterbury by disseminating the Plaintiff's CORI to the City of

Waterbury.

To establish a claim for intentional interference with advantageous relations a

plaintiff must show that the defendant intentionally and improperly interfered, with a

known "business relationship or contemplated contract of economic benefit." <u>United</u>

<u>Truck Leasing Corp. v. Geltman</u>, 406 Mass. 811, 813-815 (1990); <u>Comey v. Hill</u>, 387

Mass. 11, 19 (1982). The plaintiff must further demonstrate the loss of economic

advantage as a direct result of the defendant's conduct. <u>Sharrat v. Housing Innovations,</u>

<u>Inc.</u>, 365 Mass. 141, 148 (1947). To demonstrate improper interference the plaintiff must

show that the interference is wrongful by some measure beyond the fact of interference

itself such as improper motives or use of improper means. <u>United Truck Leasing Corp. v.</u>

<u>Geltman</u>, 406 Mass. at 816. Motivation of personal gain, including financial gain is

generally not enough to satisfy the improper interference requirement. <u>King</u>, 418 Mass.

at 587. Similarly, personal dislike will not warrant a finding of improper interference.

<u>Id.</u>

In the present case, the Defendants intentionally interfered with a known

employment relationship between the Plaintiff and the City of Waterbury by faxing the

Incident Report and related materials to the City of Waterbury. For the reasons discussed more fully above, the Defendants carried out their interference with Plaintiff's employment relationship by improper means in that the Incident Synopsis and the information contained therein constituted CORI which should not have been disseminated to the City of Waterbury. Moreover, given the blatant illegality of the Defendants' dissemination of Plaintiff's CORI, the Defendants' knowledge that the hostility between the Plaintiff and Officer Nickinello arose from a dispute over a failed real estate transaction between the parents of one of their own – fellow Officer Nickinello, and the fact that Defendants knew or should have known that Plaintiff's employment would be adversely affected as a result of the unlawful disclosure of his CORI, the only permissible inference is that the Defendants' actions were motivated by a desire to punish or harm the Plaintiff. Finally, for the reasons set forth above, the conclusion is warranted that the Plaintiff was involuntarily transferred as a direct result of the Defendants' dissemination of Plaintiff's CORI to the City of Waterbury.

**F.    THE DEFENDANTS INTENTIONALLY AND/OR NEGLIGENTLY INFLICTED SEVERE EMOTION DISTRESS UPON THE PLAINTIFF BY DISSEMINATING PLAINTIFF'S CORI TO PLAINTIFF'S EMPLOYER**

In order to establish a claim for intentional infliction of emotional distress, the plaintiff must show:

> "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community'; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was 'severe' and of a nature 'that no reasonable man could be expected to endure it.'"

18

Agis v. Howard Johns Co., 371 Mass. 140, 144-145 (1976).

Because the Defendants' dissemination of Plaintiff's CORI was unlawful and amounted to a serious and substantial invasion of Plaintiff's privacy, the Defendants knew or should have known that their actions would likely cause the Plaintiff emotional distress, and the Defendants actions in disseminating Plaintiff's CORI were extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community. Moreover, the emotional distress experienced by the Plaintiff manifested itself through an increase in Plaintiff's blood pressure and, on one occasion, an anxiety attack that brought the Plaintiff to the emergency room. Zayotti Affidavit, Exh. A, at 224-227.

## IV. CONCLUSION

WHEREFORE, based upon the foregoing points and authorities the Plaintiff respectfully requests that this Honorable Court grant the Plaintiff's Motion for Summary Judgment.

MARTIN J. GALVIN, JR., ED.D.
Respectfully submitted,

Matthew P. Zayotti, BBO #638265
Keegan Werlin LLP
265 Franklin Street
Boston, Massachusetts 02110-3113
(617) 951-1400

Dated:  March 31, 2006

---

**CERTIFICATE OF SERVICE**
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on

March 31, 2006

Matthew P. Zayotti.