UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11958-RGS

MARTIN J. GALVIN, JR., ED.D.,

             Plaintiff,

vs.

THE TOWN OF YARMOUTH, PETER
L. CARNES AND STEVEN XIARHOS,

             Defendants.

## AFFIDAVIT OF MATTHEW P. ZAYOTTI, ESQ. IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, Matthew P. Zayotti, Esquire, do hereby state and depose as follows:

1.      I am an associate with the law firm Keegan Werlin LLP, and I am an attorney in good standing of the bar of the Commonwealth of Massachusetts.

2.      I represent the Plaintiff Martin J. Galvin, Jr., Ed.D. in connection with the above-captioned action.

3.      Attached to this affidavit as Exhibit A are true and accurate excerpts from the transcript of the Deposition of Martin J. Galvin.

4.      Attached to this affidavit as Exhibit B is a true and accurate copy of a motion for endorsement of lis pendens filed by Martin J. Galvin and Cynthia A. Galvin in connection with a civil action they commenced in Barnstable Superior Court against Louis R. Nickinello and Patricia R. Nickinello.

5.      Attached to this affidavit as Exhibit C is a true and accurate copy of a complaint filed by Louis R. Nickinello and Patricia R. Nickinello in Barnstable District Court against Martin J. Galvin and Cynthia A. Galvin.

6.      Attached to this affidavit as Exhibit D is a true and accurate copy of a Yarmouth Police Department Officer's Report dated July 5, 2001.

7.      Attached to this affidavit as Exhibit E is a true and accurate copy of a Yarmouth Police Department Officer's Report dated August 1, 2001.

8.      Attached to this affidavit as Exhibit F is a true and accurate copy of a fax from Chief Peter L. Carnes/Lieutenant Xiarhos and the Yarmouth Police Department to Mr. Frank Lombardo, Incident Synopsis, and Protective Custody Report.

9.      Attached to this affidavit as Exhibit G is a true and accurate copy of a letter dated July 10, 2001 from David L. Snead, Ph.D., Superintendent of Schools, Waterbury Public Schools to Martin J. Galvin, Ed.D.

10.     Attached to this affidavit as Exhibit H is a true and accurate copy of a Settlement Agreement by and between the School Administrators of Waterbury, Dr. Martin J. Galvin and the Waterbury Board of Education dated June 11. 2003.

11.     Attached to this affidavit as Exhibit I is a true and accurate copy of a memorandum from David L. Snead, Ph.D., Superintendent of Schools to Martin J. Galvin, Ed.D., Principal, Adult Education, dated May 20, 2002.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _31st_ DAY OF MARCH, 3006.

_[signature]_

CERTIFICATE OF SERVICE
I hereby certify that this document filed thought the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on _March 31, 2006_
_[signature]_

## *EXHIBIT A*

COPY UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-11958-RGS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
MARTIN J. GALVIN, JR. ED.D,                )
          Plaintiff;                       )
                                           )
     vs.                                   )
                                           )
THE TOWN OF YARMOUTH,                       )
PETER L. CARNES AND STEVEN XIARHOS,        )
          Defendants.                      )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


          DEPOSITION OF MARTIN J. GALVIN, a

witness called on behalf of the Defendant,

pursuant to the provisions of Rule 30 of the

Massachusetts Rules of Civil Procedure,

before Meredith A. Fairbanks, a Notary Public

and Shorthand Reporter in and for the

Commonwealth of Massachusetts, at the offices

of Brody, Hardoon, Perkins & Kesten, One

Exeter Plaza, Boston, Massachusetts 02116, on

Friday, November 4, 2005, commencing at 10:25

a.m.


     DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
                    One State Street
              Boston, Massachusetts 02109
              Telephone (617) 742-6900

1   Q.   Had you seen him at all during the day?

2   A.   No.

3   Q.   Had you seen any member of the Nickinello

4        family that day?

5   A.   No.

6   Q.   At the time that you left Alfie O'Shea's

7        house, were you angry about anything?

8   A.   No.

9   Q.   Upset about anything at all?

10  A.   Well, I was upset that I was no longer a part

11       of the neighborhood; that I had lost,

12       literally, had a house pulled out from

13       underneath me.

14  Q.   Well, let's, without getting into the details

15       about the house situation, I want to talk to

16       you about your feelings.  At that time that

17       you left Alfie's house, were you thinking

18       about the problem that you had with the

19       Nickinellos and that real estate transaction?

20  A.   That probably crossed my mind, yes.

21  Q.   So you got angry?

22  A.   I got angry?  No.

23  Q.   You weren't angry?

24  A.   No.

1  where Lou Jr. was living at that point and

2  he's standing over here (indicating).

3  Q. Where the circle is there?

4  A. Yes.  There was no one else that I could see

5  in the backyard, so I'm assuming he made the

6  comment to me.  You know.

7  Q. Hey, principal?

8  A. Yes.

9  Q. Okay?

10 A. Obviously, the feelings over this whole

11 situation between the Nickinellos and myself

12 were kind of intense.  I didn't know whether

13 it was a complimentary or derogatory.

14 Q. So by the tone of voice, you didn't

15 immediately think that was hostility?

16 A. Well, I thought it was challenging.

17 Q. Okay.  Did Lou Jr. have anything to do with

18 the real estate dispute that you had with his

19 parents?

20 A. Yes.

21 Q. So there was some feeling between you and Lou

22 Jr. as well as his parents?

23 A. Well, he's the reason why they reneged on the

24 buyer-seller agreement.

1    Q.   Okay.

2    A.   He was living in Sandwich with a girlfriend.

3         He had two children from a previous marriage,

4         two girls.  They had bought a house in

5         Sandwich together.  Things weren't working

6         out.  They sold the house while this was

7         under agreement and then, all of a sudden,

8         Nickinellos started having problems with the

9         sale when I already had sold this.

10   Q.   When you'd already sold 41?

11   A.   Yes.

12   Q.   Well, I want to avoid, for the time being,

13        the details of the real estate dispute.  But

14        I want to go back to clarify something you

15        just said about Lou Jr. in Sandwich.  Was

16        that a place that he lived at with his

17        girlfriend?

18   A.   With his girlfriend.

19   Q.   And he and his girlfriend owned the house in

20        Sandwich?

21   A.   That's my understanding.

22   Q.   And they split up and sold the house?

23   A.   That's what I heard.  I don't have, you know,

24        detailed knowledge of that that I can hang my

1           hat on.

2     Q.    As far as you know, that's the situation?

3     A.    Right.

4     Q.    Now, when you say intense feelings, do you

5           mean resentment, anger?

6     A.    Well, there's definitely resentment on my

7           part.

8     Q.    You felt like you'd been wronged?

9     A.    Well, yeah.  It cost me a lot of money.

10    Q.    And you said earlier that you were upset

11          about not being, not living or having a place

12          in that neighborhood anymore as you left

13          Alfie O'Shea's house.  That's connected with

14          the Nickinello real estate dispute, right?

15    A.    Right.  The problem was my, the whole reason

16          why we rented this was --

17    Q.    The Chambers' place?

18    A.    Right.  Because my mother was very, very

19          upset that she no longer had a place to go to

20          at the Cape.  Because I had done this,

21          thought I had written and verbal commitment

22          from the Nickinellos.  Next thing I know, I'm

23          out.  I don't have a house.  Okay?

24              So, you know, my mother, at that point,

```
1          she's 87 now, so in 2000 she was, what?
2          Let's say 80, for the sake of argument.  I'm
3          not doing the math.  She was very upset
4          because her whole life from '73 was spent
5          here.
6     Q.   At 41?
7     A.   Right.
8     Q.   Okay.
9     A.   Okay?
10    Q.   So a lot of family ties, a lot of emotion,
11         good memories, sentiment involved in this
12         neighborhood, in those houses, and it was
13         blown apart and you're not happy about it,
14         right?
15    A.   I'm not happy about it?  No, I wasn't happy
16         about it.  No.
17    Q.   So as you walk past the fence, you hear,
18         "Hey, principal"?
19    A.   Right.
20    Q.   And you look to the left and you see Lou
21         standing on the deck near a grill?
22    A.   Right.
23    Q.   Was he cooking something?
24    A.   At that point, I didn't even notice what he
```

```
 1              was doing.  I just saw him on the deck.
 2    Q.   So what did you do when you turned and saw
 3         him?
 4    A.   Well, I said, "What do you mean?"  You know,
 5         I, in the city of Waterbury where I've been a
 6         principal and I held administrative positions
 7         for years, I don't have people calling me
 8         "Hey, principal."  You know.  They call me my
 9         name or they smile or whatever.  So I took it
10         as meaning, you know, it was, to me,
11         derogatory.  Okay?
12    Q.   Disrespectful?  Antagonistic?
13    A.   Yes, definitely.
14    Q.   So, "Hey, what do you mean," you say to Lou
15         Jr.?
16    A.   Yes.
17    Q.   And what was his response?
18    A.   You know, from what I remember, we, he smiled
19         and kind of, to me, he was laughing and it
20         just went downhill from that point on.
21    Q.   So what was the next thing that happened?
22    A.   Well, we started exchanging adjectives.
23    Q.   Profanities?
24    A.   Yes.
```

1   Q.   What did you say to him in response to his,

2        you know, smiling or laughing?  He was

3        mocking you, you felt?

4   A.   Yeah.  I called him "the boy with the golden

5        spoon in his mouth."  That was a term that

6        was used in the neighborhood for years.

7   Q.   The Nickinellos have some money?

8   A.   Yes.

9   Q.   Basically?

10   A.   Yes.

11   Q.   They're established financially?

12   A.   Yes.

13   Q.   What did he say when you said boy with the

14        golden spoon in his mouth?

15   A.   Well, he didn't, didn't like it.  I couldn't

16        tell you exactly what he said.  Like I said,

17        it was just going back and forth.  We were

18        arguing over the fence.

19   Q.   Calling each other names?

20   A.   I would say so.

21   Q.   Were you talking about anything else or just

22        insulting each other?

23   A.   Insulting each other.

24   Q.   Using bad language?

1    A.    Correct.

2    Q.    Did he call you any names?

3    A.    Not that I can remember.

4    Q.    Did he swear at you?

5    A.    Yes.

6    Q.    What did he say?

7    A.    I don't remember exactly, but I know he was

8          swearing at me.

9    Q.    You can't recall what terms?

10   A.    No.  No.

11   Q.    What about you, what were you saying?

12   A.    I was reciprocating.

13   Q.    What words were you using?

14   A.    I was calling him a spoiled S.O.B. type of

15         thing.  Because, you got to understand,

16         whatever Louie wanted he got as a kid.  And

17         little Louie was not a worker where Jeffrey

18         was, Greg was.  So he was kind of the golden

19         boy.  You know.  That type of thing.

20   Q.    Okay.  So you're calling him spoiled and an

21         S.O.B., but I'm getting the picture that you

22         were using some obscene language as well and

23         I'm trying to get an idea from you what you

24         said?

1 Q. Print, radio, television, internet, anything

2   else?

3 A. Through a media service?  No.

4 Q. Okay.

5    MR. ZAYOTTI:  I'm sorry, can I just

6   clarify, did you say media or medium?

7    MR. CAMPBELL:  Medium.

8 A. Oh, medium?  Do I have any knowledge?

9 Q. (By Mr. Campbell)  Yes.  That's my question.

10 A. Right here (indicating).

11 Q. I mean --

12 A. There's a medium of a political-appointed

13   aide.  There's the medium of Mr. Mahaney, an

14   attorney, and Superintendent of Schools,

15   Assistant Superintendent of Schools, two

16   other attorneys, John Gesmonde and Mrs.

17   Cheney.  I don't know how many people saw it.

18 Q. Okay.

19 A. I don't know if board members saw it.  I

20   suspect they did.

21 Q. I think I understand.  When is the first time

22   that you heard that that information had been

23   sent out to Frank Lombardo or anyone else?

24 A. Again, I wish I had a calendar.  I don't know

1           where 4th of July fell, whether it was a

2           Saturday, Friday, Monday, whatever.  My

3           position is 12 months and I traditionally

4           always took the last week of June through 4th

5           of July, returned to work on the 5th or 6th

6           if it wasn't a Saturday or Sunday.

7    Q.     Okay.

8    A.     Okay?  When I arrived at work is when I got

9           the phone call from John Gesmonde, the

10          attorney for the administrators.  The time of

11          the day, it was in the morning.

12   Q.     Let me stop right there.  The administrators

13          is the Waterbury Public Schools

14          Administrators Union?

15   A.     School Administrators of Waterbury.  S.A.W.

16   Q.     Okay.  And that's a union?

17   A.     That's the union.

18   Q.     So the first business day after July 4th you

19          get a phone call from this lawyer, right?

20   A.     Mm-hmmm.

21   Q.     Okay.

22   A.     And at that point, I didn't see this

23          (indicating).

24   Q.     Okay.  The first time you saw it was when you

1   met with Dr. Snead?

2 A. No.  I think, I think John Gesmonde sent it

3   to me and asked me to return the call.  Once

4   I looked at it, he wanted to know whether I

5   was aware of this or not.

6 Q. Okay.  So John, can you spell his last name

7   for me?

8 A. G-E-S-M-O-N-D-E.  His office is in Hamden,

9   Connecticut.

10 Q. And he said, "Here is the documentation.

11   Look at it and give me a call back"?

12 A. Yeah.  Right.

13 Q. Did anyone else provide you with

14   documentation prior to the meeting with

15   Dr. Snead?

16 A. Not that I remember, no.

17 Q. Did Gesmonde send it to you because it was

18   information that was being used in connection

19   with a disciplinary proceeding?

20 A. Well, I believed that at the time he received

21   it or he saw it or whatever, they were in

22   some kind of a meeting, Cheney representing

23   the city and Gesmonde was, he's been involved

24   with the city in a lot of different

1            positions, not an employee, but as an

2            attorney representing different groups.

3      Q.   Mm-hmmm?

4      A.   He just wanted to verify it, you know, what's

5            going on.  Because Cheney said to him, "John,

6            we got a problem."

7      Q.   Okay.

8      A.   Now, who was in the room, all that, I have no

9            idea.

10               MR. CAMPBELL:  All right.  Let's mark

11           this.

12             (The stenographer marked the document

13           Exhibit No. 7 for identification.)

14     Q.   (By Mr. Campbell)  I'm showing you a small

15           calendar for July of 2001.  Can you?

16     A.   I would assume I was back to work on the

17           following Monday the 9th.

18     Q.   Monday the 9th you returned to work?

19     A.   Yes.

20     Q.   And July 4th was a Wednesday that year?

21     A.   Yes.

22     Q.   So to the best of your memory, July 9th would

23           have been the day you find out that this

24           information has been broadcast somehow;

1           correct?

2    A.     Correct.

3    Q.     All right.  Exhibit 7 is a letter addressed

4           to you from Dr. Snead dated July 10, 2001?

5    A.     Mm-hmmm.

6    Q.     And this is the letter that is referred to in

7           Paragraph 12 of your complaint; correct?

8           "Shortly thereafter," I'm quoting from the

9           paragraph, "Dr. Galvin received written

10          notice from his employer by letter dated July

11          10, 2001, that the Yarmouth Police Department

12          had reported the incident to his employer."

13          Same document?

14   A.     Correct.

15   Q.     Okay.  What happened as a result of this

16          letter?  Did you then go in and have a

17          meeting with Dr. Snead?

18   A.     I had a meeting with him with union

19          representation and Mr. Gesmonde.

20   Q.     Who was union representation?  A shop

21          steward?

22   A.     The president of the union, Matt Larkin.

23   Q.     Is he an employee of the Waterbury schools?

24   A.     He was.  He's retired.

1    Q.   And the union lawyer, Mr. Gesmonde?

2    A.   Correct.

3    Q.   Along with Dr. Snead?

4    A.   Correct.

5    Q.   Anyone else from Dr. Snead's office present?

6    A.   I believe Mr. Egen, the personnel director,

7         was present.

8    Q.   He's personnel director of the schools?

9    A.   He was.  He recently left.

10   Q.   Okay.  When did the meeting take place?

11   A.   I would have to guess, or look at my notes,

12        that it probably took, took place a couple of

13        days after the 10th, after receiving this the

14        10th.  Maybe the next week.  I'm not sure.  I

15        don't remember.

16   Q.   What happened at the meeting?

17   A.   Well, he, he asked for clarification, what

18        was going on, and I said, first of all, I was

19        not arrested.  I didn't deny what took place.

20        You know.  That's when I looked at what was

21        in here.  I took a strong stance on all the

22        allegations in here.  They had nothing to do

23        with the incident.

24   Q.   Referring to the incident synopsis, you

```
 1              disputed what was contained in the incident

 2              synopsis?

 3    A.    Right.

 4    Q.    What in there did you dispute?

 5    A.    That I'd been harassing the Nickinello

 6              family.  Okay?

 7    Q.    Was the incident itself, did that constitute

 8              harassment of the Nickinello family?

 9              MR. ZAYOTTI:  Objection.

10    A.    Matter of opinion.

11    Q.    (By Mr. Campbell)  Reasonable minds could

12              disagree on that point?

13              MR. ZAYOTTI:  Objection.  The letter

14              reads, "Martin J. Galvin, Jr., has been

15              harassing the Nickinello family again."

16    A.    This is plural.

17    Q.    (By Mr. Campbell)  Well, I'm talking about

18              July 4th.  That's my question.

19              MR. ZAYOTTI:  Can you ask it again?

20    Q.    (By Mr. Campbell)  Is it fair to characterize

21              the July 4th incident as harassment of the

22              Nickinello family?

23              MR. ZAYOTTI:  Objection.

24    A.    As harassment?  Harassment to me, if you look
```

```
 1              up the definition of the word harassment, it
 2              means that, number one, I'm initiating it.
 3              Number two, it's not the first occurrence.
 4              I'm on this person.  I'm harassing you.  When
 5              you turn the corner, I'm going to be there.
 6     Q.       (By Mr. Campbell)  Okay?
 7     A.       You know.  It's not a one-time incident.
 8     Q.       Had you ever previously harassed any member
 9              of the Nickinello family?
10     A.       I had a discussion with the father over the
11              phone, and I don't think he appreciated that
12              one day.  He may consider it harassment.
13     Q.       What did you say to him that he might have
14              considered harassment?
15     A.       I was asking him why he did that; why he went
16              back on his word; why did he throw a
17              friendship out the window; why wasn't he
18              giving me back my $20,000 down payment; why
19              did he take personal property out of that
20              house and put it in a storage area so I
21              couldn't get at it; why did he have my boat
22              and trailer auctioned off.
23     Q.       When did you have this conversation with him?
24     A.       It was very early after the whole thing broke
```

1    Q.    So they were all surprised that they'd come

2          into possession of this information from the

3          Yarmouth Police Department?

4    A.    Well, they didn't come in possession.  They

5          wanted to know how Mr. Lombardo got it.

6    Q.    Did Mr. Lombardo tell them how he got it?

7    A.    I have no idea.

8    Q.    Do you have any information about what

9          Mr. Lombardo says about that?

10   A.    No.

11   Q.    Do you have any reason to dispute that Frank

12         Lombardo might have asked Lieutenant Xiarhos

13         to fax it to him?

14   A.    Do I have any doubt?

15   Q.    Yes.

16            MR. ZAYOTTI:  Objection.

17   Q.    (By Mr. Campbell)  Do you dispute that Frank

18         Lombardo asked Lieutenant Xiarhos to fax the

19         material to him?

20   A.    Well, obviously, since you can pick up a book

21         that every police department probably has

22         listing who the Superintendent of Police are

23         for each community, or now you can go online

24         and see that, why he, in his position --

```
 1    Q.    The lieutenant?

 2    A.    Right.  And the superintendent, Mr. Carnes,

 3          why they would send that kind of information

 4          to a non-police officer and have the audacity

 5          to put this on it (indicating).

 6    Q.    The "Law Enforcement Use Only" piece?

 7    A.    Right.

 8    Q.    Well, let me ask you a hypothetical question.

 9          Do you think it's appropriate for high school

10          principals to become extremely intoxicated,

11          destroy property, scream profanities at

12          people, make threats to people who are in

13          their own yards cooking dinner for their

14          kids?

15                MR. ZAYOTTI:  Objection.

16    A.    I don't know of any high school principal

17          that did that.  I know some high school

18          principals that certainly screamed at people

19          and have been involved in personal situations

20          which may be interpreted they probably

21          shouldn't have gotten themselves involved.

22    Q.    (By Mr. Campbell)  Well, I'm talking about

23          this incident, the July 4th incident.  It's

24          been characterized by Lou Nickinello and
```

1     Q.   (By Mr. Campbell)   That's not what I asked

2          you.   My question was, if an employer came

3          into possession of this information, would it

4          be fair for them to be concerned?

5               MR. ZAYOTTI:   Objection.

6     A.   Yes.

7     Q.   (By Mr. Campbell)   Okay.

8     A.   Yes.

9     Q.   And in this situation, Dr. Snead indeed did

10         express some concern to you about the

11         allegations that were contained in the

12         Yarmouth reports; correct?

13    A.   Certainly.

14    Q.   And what happened as a result of his

15         expression of concern?

16    A.   Well, the legality of the notification was

17         discussed amongst the attorneys and they felt

18         that they should not have been given this

19         information the way it was given, the route

20         it was given.   Okay?   That was part of the

21         conversation.

22            The rest of the conversation was that

23         Dr. Snead knew me, knew my performance.   For

24         an alcohol abuser to have 640 sick days in a

```
 1              of the July 10th letter from Dr. Snead was,
 2              you know, at the meeting this incident was
 3              addressed, the July 4th incident was
 4              addressed, the dissemination of the
 5              information was discussed, and there was no
 6              further action taken at that time; correct?
 7    A.        Correct.
 8    Q.        That was the end of it for that period of
 9              time; correct?
10    A.        (Witness nods head.)
11    Q.        Yes?
12    A.        Yes.
13    Q.        When was the next time that this incident
14              came up with respect to your job?
15    A.        Well, I think the incident came up when the
16              NEASC report hit.
17    Q.        The accreditation report?
18    A.        Accreditation.  My, what I feel happened,
19              that this was shared with board members.
20    Q.        You mean Exhibit 6 was shared with Board of
21              Education?
22    A.        The content of it.  I don't know if the
23              exhibit itself was shared.
24    Q.        Do you have any information or is that a
```

1    A.    What information do I have?

2    Q.    Yes?

3    A.    That it played part?

4    Q.    Yes.  That's my question.

5    A.    I can only go by past practice.  Kennedy High

6          School was put on probation.  Crosby High

7          School was four out of the five negative.

8          Wilby comes up, seven out of seven.  All of a

9          sudden, I'm moved, the other two aren't.

10   Q.    And you say, well, let me follow up on my

11         previous question by asking you, do you have

12         any witness or piece of paper that's going to

13         say you were transferred as a result of the

14         Yarmouth Police?

15   A.    I can't speak for other witnesses.

16   Q.    Do you have any pieces of paper that show

17         that the Yarmouth Police actions contributed

18         to the cause of your transfer?

19         MR. ZAYOTTI:  Objection.

20   A.    I believe we've subpoenaed them for all the

21         records.  You know.  Whether it's going to be

22         in there or not, we'll have to wait until

23         they respond to the subpoena.

24   Q.    (By Mr. Campbell)  And you have no

1     information as you sit here today that anyone

2     from the Waterbury Public Schools is going to

3     say that the Yarmouth Police Incident Report

4     was a cause of your transfer?

5          MR. ZAYOTTI:  Objection.

6     A.   I don't know what they're going to say.

7     Q.   (By Mr. Campbell)  Okay.  Obviously, this

8     Yarmouth incident took place on July 4, 2001.

9     When were you transferred out of your job as

10    Wilby High School president?

11    A.   April -- it would have been either three or

12    four years ago.  As of April.  I'd have to

13    look at a -- I don't have it.  For the exact

14    date.  I couldn't give you an exact date off

15    the top of my head, the transfer date.

16    Q.   It would have been in April of 2002; is that

17    correct?  I'll show you a newspaper article

18    that's dated Thursday, April 25, 2002, and

19    the headline is "Transfer Protested:

20    Parents/Students at Kennedy will be Unhappy

21    About Changes."  That's --

22    A.   Yes.  I would have to -- that's when it took

23    place.

24    Q.   So ten months after the protective custody

1          incident, right?

2     A.   Yes.

3     Q.   Did you see any newspaper reports that

4          indicates that Wilby High School was the only

5          high school out of more than 600 that that

6          accreditation agency reviewed that had

7          failing marks in all seven categories?

8     A.   I saw an article that's claimed that.

9     Q.   Do you have any reason to dispute that?

10    A.   Hartford High School.

11    Q.   Hartford High School failed all seven

12         categories?

13    A.   Yes.

14    Q.   When?

15    A.   Probably six months, eight months ahead of

16         us.  It's occurred in several high schools.

17    Q.   Has it ever occurred before in Waterbury?

18    A.   Not to my knowledge.  If it occurred before,

19         you know, I'm unaware of it.

20    Q.   The high school had been accredited on the

21         previous review; correct?

22    A.   After a period of probation.

23    Q.   Wilby High School?

24    A.   Yes.

1    Q.    (By Mr. Campbell)   Well, the transfer

2          happened after they learned the school was

3          placed on probation for failing all seven

4          sections of the standards; correct?

5    A.    Correct.

6    Q.    You weren't transferred.   In fact, you

7          suffered no discipline of any description

8          after they learned, or Dr. Snead learned, of

9          the July 4th incident; correct?

10             MR. ZAYOTTI:   Objection.   The transfer

11         happened after that meeting and after that

12         information was disclosed.   If you're

13         saying contemporaneously...

14   Q.    (By Mr. Campbell)   Can you answer my

15         question, Mr. Galvin?

16   A.    In my opinion?   I think it definitely

17         influenced them.   You're asking a question

18         that requires an opinion, I'm assuming.

19   Q.    The question is, Dr. Snead learns about this

20         incident no later than July 10th of 2001, the

21         Yarmouth incident; correct?

22   A.    Correct.

23   Q.    And there's a meeting, a discussion of the

24         incident, but you were not disciplined or

```
 1              demoted or you suffered no negative

 2              consequences; correct?

 3                   MR. ZAYOTTI:  Objection.

 4    Q.   (By Mr. Campbell)  In July of 2001; correct?

 5                   MR. ZAYOTTI:  Objection.

 6    A.   Was I transferred in July?  No.

 7    Q.   (By Mr. Campbell)  Did you get a pay cut?

 8    A.   No.

 9    Q.   Did you get a new office?

10    A.   No.

11    Q.   There was no change in your job duties, job

12              description, your responsibilities or pay

13              grade, right?

14                   MR. ZAYOTTI:  Objection.

15    Q.   (By Mr. Campbell)  In July of 2001?

16                   MR. ZAYOTTI:  Okay.

17    A.   As of July 2001.  Correct.

18    Q.   (By Mr. Campbell)  And the same holds true

19              for August of 2001; correct?

20    A.   Correct.

21    Q.   And, in fact, the same holds true all the way

22              through to April of 2002; correct?

23    A.   Correct.

24    Q.   And April of 2002 also happens to be the time
```

1          when the accreditation report was released;

2          correct?

3    A.    Correct.

4    Q.    In fact, it's fair to say that your transfer

5          took place within a matter of days after the

6          first newspaper report that Wilby High had

7          failed all the accreditation standards;

8          correct?

9              MR. ZAYOTTI:  Objection.

10   A.    I would have to look at dates.

11   Q.    (By Mr. Campbell)  How would you get those

12         dates?

13   A.    When the report was released and when the

14         transfer took place.

15   Q.    Do you know what day the transfer took place?

16   A.    I believe it was April 26th.

17   Q.    Here is a copy of the accreditation report.

18         What's the date of the accreditation report?

19   A.    April the 22nd through 25th.

20             MR. CAMPBELL:  Let's mark this

21         accreditation report as an exhibit.

22            (The stenographer marked the document as

23         Exhibit No. 8 for identification.)

24   Q.    (By Mr. Campbell)  Let's talk about the

```
 1    Q.   Do you have an obligation to report a

 2         criminal conviction to your employer?

 3              MR. ZAYOTTI:  Objection.

 4    A.   No.

 5    Q.   (By Mr. Campbell)  Is there a law in

 6         Connecticut that requires employees of school

 7         departments to report criminal convictions to

 8         the superintendent or the Board of Education?

 9              MR. ZAYOTTI:  Objection.

10    A.   I just said no.

11    Q.   (By Mr. Campbell)  There is no law, no such

12         law?

13    A.   Not that I'm aware of.

14    Q.   Okay.  So did you report those incidents to

15         your employer?

16    A.   No.

17    Q.   I wanted to look at your answers to

18         interrogatories, Dr. Galvin, and talk about

19         those for a minute, if I can find what I did

20         with them.  Here we go.

21              MR. CAMPBELL:  Let's, by the way, let's

22         mark that paper that we were just discussing

23         because that will make sure that I remember

24         to give you a copy.
```

1    A.    Yes.

2    Q.    You list James Uberti.  He's your primary

3          care physician?

4    A.    Correct.

5    Q.    What information does he have?

6    A.    Well, he reads newspapers.  He was very well

7          aware of the transfer.  As far as this

8          particular incident, I don't think he has any

9          knowledge of that, that I know of.  He may.

10         He just knows, knows me.

11   Q.    Did he ever provide you with any medical

12         treatment that arose out of any of the

13         allegations you're making in your complaint?

14   A.    Well, I, prior to the incident and this

15         whole, there was a lot of things going on;

16         divorce, the accreditation, this thing.  I

17         had no physical problems other than knee

18         problem that had been since I was 20 years of

19         age.

20           At that point, he was very concerned with

21         my blood pressure was up.  The history of my

22         family is heart attacks.  He knew I was under

23         a lot of pressure and that's where his

24         interest comes in.

```
1    Q.   Has Dr. Uberti ever told you that you have
2         any medical condition that's related to what
3         Yarmouth Police did?
4              MR. ZAYOTTI:   Objection.
5    A.   I already said he does not have knowledge, to
6         my knowledge, of that incident.   No.
7    Q.   (By Mr. Campbell)   He doesn't have any
8         knowledge of what happened in Yarmouth on
9         July 4th?
10   A.   I don't believe so.   I never asked him.
11   Q.   So his knowledge is of what, your medical
12        condition in the months after this incident
13        took place?
14   A.   Correct.
15   Q.   Okay.   And he would say that you were under
16        stress, and your blood pressure was high?
17   A.   Yes.   It was obvious all this going on at
18        once was having an effect.   I even had an
19        event where I spent the afternoon in the
20        emergency room.
21   Q.   When was that?
22   A.   That was right around the same time, time
23        frame.
24   Q.   Of July '01 or April '02?
```

```
 1    A.    I would say it was in, in the fall of that
 2          year.  I, again, would have to get the
 3          records to make sure I'm giving you the right
 4          date.
 5    Q.    What was the name of the hospital?
 6    A.    St. Mary's Hospital.
 7    Q.    Where is that?
 8    A.    Waterbury.  It was a Friday afternoon.
 9    Q.    What did you have?  Was it an anxiety attack
10          or something?
11    A.    Well, they put a monitor on me.  My heart was
12          going a little crazy.  I was light-headed.  I
13          was at school.
14    Q.    Were you at the Wilby school when this
15          happened?
16    A.    Yes.  School nurse got very concerned because
17          I, I was just bouncing off of walls.  I mean,
18          I couldn't walk straight and I felt, felt
19          very strange.
20    Q.    What did the doctors tell you had happened to
21          you?
22    A.    They termed it an event.  They didn't say it
23          was a stroke, small stroke, anything like
24          that.  They just said, "You had an event.  We
```

1           can't explain it."

2   Q.   Let me ask you a more general question.  In

3           this case, are you saying that you've

4           suffered any physical manifestations of

5           injury arising from what the Yarmouth Police

6           did?

7   A.   Am I saying any physical?

8   Q.   Yes.

9   A.   I would attribute the increase in my blood

10          pressure.

11   Q.   Okay.  Has any doctor ever made the

12          connection between those two things, your

13          blood pressure and the Yarmouth Police?

14   A.   No.

15   Q.   I want to ask you about another question

16          regarding your damages.  You say in the

17          automatic disclosures that Mr. Zayotti gave

18          me, there's a computation of damages that

19          Mr. Zayotti put together, which I'll show to

20          you.  Do you see Paragraph C here it sets

21          forth damages that you've suffered and the

22          first category is "Loss of Future Earnings

23          and Benefits:  $100,000"?

24   A.   Mm-hmmm.

1          the divorce decree and whenever I decided to

2          leave the City of Waterbury, I could use the

3          460 some-odd days and there'd be nothing.  So

4          there is no value to them.

5     Q.   Okay.

6     A.   Okay?  That's the logic he used on that, and

7          it's a pretty good logic.

8     Q.   So bottom line is, though, that the Yarmouth

9          Police incident report played no role in the

10         way that the sick days were disposed of,

11         right?

12    A.   Your guess is as good as mine.

13    Q.   And then it was ordered that the parties

14         shall equally divide both of the defendant's

15         pensions, City of Waterbury and State of

16         Connecticut; correct?

17    A.   Correct.

18    Q.   And we've gone over that.  "It is ordered

19         that the balance of the parties' deposit of

20         $21,000 in relation to the Cape Cod

21         litigation shall be split equally by the

22         parties."  Was that an unfair result that --

23    A.   Well, there was no $21,000.  Mr. Nickinello

24         never gave it up.

1    Q.    Well, that's, I'm talking about the judge's

2          order.  Did the judge order something that

3          was unfair?

4    A.    My opinion?  Yes.  I already said that.

5          Okay?

6    Q.    The $21,000 should not have been split

7          equally?

8    A.    It came out of my pocket.

9    Q.    Do you think that he made that order because

10         of the Yarmouth Police incident disclosure?

11   A.    In the proceedings, it was proven she gave me

12         $100 each paycheck towards the expense of

13         raising a family and maintaining the

14         properties.  Her average paycheck is 11 to

15         1200.  Do you think that's fair?

16   Q.    Did anyone tell you that this arrangement

17         with respect to the $21,000 escrow was an

18         unfair division of asset?

19   A.    Did anybody tell me that?

20   Q.    Yes.

21   A.    I don't think anybody would have to.

22   Q.    Okay.  Have you got any information on how

23         divorces are normally handled with respect to

24         the division of assets?

1       message, Mr. Galvin?

2   A.  Not to my knowledge.  Did I say, "This is

3       Marty Galvin," in saying this?  I mean...

4   Q.  You never left that message, is that what

5       you're saying?

6   A.  I'm saying -- that's what I said.

7   Q.  Okay.  As of October of 2000, your own boat

8       had recently been seized and auctioned off;

9       correct?

10  A.  Correct.

11  Q.  And you were engaged in litigation with

12      Mr. and Mrs. Nickinello at the time; correct?

13  A.  Yes.  We contested the buyer-seller agreement

14      and them pulling out.

15  Q.  Did you vandalize Mr. Nickinello's boat, Lou

16      Sr.?

17  A.  I know he alleged that.  I saw that report,

18      which I didn't know existed until I got into

19      this process.  No, I did not.

20  Q.  Did anyone from the Yarmouth Police

21      Department ever question you about that?

22  A.  No.

23  Q.  So you didn't commit, do any damage to

24      Mr. Nickinello's boat?

1         of thing.

2    Q.   Okay.

3    A.   And that's basically where I see Eric.  Marc

4         has never come to the Cape where Eric has.

5         Okay?  Because Eric has the time.  Marc

6         doesn't.  His position is different.

7              MR. CAMPBELL:  I think that's it.

8              MR. ZAYOTTI:  I just have a few

9         questions, and I'll try to go through it

10        quickly so that we can all get out of here.

11        We're at just about 5:30.

12        CROSS-EXAMINATION

13   Q.   (By Mr. Zayotti)  Dr. Galvin, when you were

14        transferred from your former position as

15        Principal of Wilby High School to the

16        position of Principal of the Adult Education

17        for the City of Waterbury, how did you view

18        that transfer?

19   A.   Well, it was a reprimand.  It was a definite

20        step down.  I mean, at times they even forget

21        we exist.  You know.  The prestige of the job

22        certainly isn't there.  Adult education is a

23        much smaller operation than Wilby, Kennedy or

24        Crosby, and a less critical one.  Everything

1          that's done in adult ed. is dictated by the

2          state where you can influence things in a

3          high school.

4            Wilby was a Marine ROTC building.  We had a

5          very successful Marine Corps unit there.

6          They won the national championship, started

7          new courses for A.P.  There's a million

8          different things you can do where I don't

9          even have a legitimate facility.

10           We don't serve lunch because there is no

11         lunch room.  There's no gym.  And the total

12         number of classrooms in the building is maybe

13         16.  Wilby probably had close to 80.

14    Q.   Do you have any understanding as to how your

15         professional colleagues, both former

16         colleagues at Wilby High School and your

17         present colleagues at the adult education

18         program, might view that transfer?

19    A.   Well, they viewed it as a definite reprimand.

20         You know.  The people that know me and know

21         what I've done in the system and what we had

22         going at Wilby have a different viewpoint.

23         But they also realize, hey, this was the

24         Superintendent of Schools and Board of Ed.

1    flexing their muscle.

2        It was also a way for individuals who

3    should have done certain things to cover that

4    up and make me a pawn in the game.  I was the

5    guy that was on the limb.  They sawed it off.

6    Q.    Do you have any opinion --

7            Strike that.

8        Is it fair to say that you believe your

9    professional colleagues would view the

10    transfer as a step down?

11            MR. CAMPBELL:  Objection.

12    A.    Definitely.

13    Q.    (By Mr. Zayotti)  Do you have any

14    understanding as to how perspective future

15    employers would view a candidate coming from

16    the position of Principal of Wilby High

17    School as compared to a candidate coming from

18    the position of the Principal of the Adult

19    Education Program?

20            MR. CAMPBELL:  Objection.

21    A.    My opinion, my marketability went down the

22    toilet when the transfer was made.

23    Q.    (By Mr. Zayotti)  And what do you base that

24    opinion on?

```
 1   A.   Well, being involved in the profession.  It

 2        would be almost like hiring the

 3        superintendent of a school system that

 4        totally failed, and was identified as a

 5        failing school using the new No Child Left

 6        Behind terms.  Why would a Board of Ed. do

 7        that?  Why would any employer do that?

 8   Q.   Do you have any understanding as to which

 9        type of candidate would be more preferable or

10        be better qualified as between Principal of

11        Wilby High School or Principal of the Adult

12        Education Program?

13   A.   Well, definitely a --

14             MR. CAMPBELL:  Objection.

15   A.   Definitely the, if I was a candidate from the

16        position of high school principal without the

17        label of being transferred I would definitely

18        be much more marketable than I am now.

19   Q.   (By Mr. Zayotti)  How about without the label

20        of being transferred?  How about just if you

21        took a comparison between the two positions,

22        which one would be viewed more favorably by a

23        perspective employer?

24             MR. CAMPBELL:  Objection.
```

1    A.    Okay.  What's interesting is there was never

2          a principalship over the Adult Education

3          Program.  There, at one point, was a Director

4          of Adult Education and that's the term that's

5          the practice around the whole state of

6          Connecticut.  So when people will ask me, Are

7          you the director?  What do you mean you're

8          the principal?

9              The principals at Adult Education were

10         normally retired administrators who were

11         working with no contract and paid on an

12         hourly basis.  I'm the first principal to

13         ever be assigned down there that I'm actually

14         contracted, benefits, the whole thing, and

15         I'm in the bargaining unit.  That's the other

16         thing.  I'm the first individual from the

17         bargaining unit that would be put into that

18         placement.

19             So just that concept alone, the difference

20         between being a high school principal and

21         a -- they say they didn't change my title,

22         that I'm still a high school principal

23         assigned to Adult Education.

24             Well, yearly, I attended the New England

1           Association of Schools and Colleges

2           conference right here in Boston every year.

3           I can't, can't attend it now because I'm no

4           longer a principal of a legitimate high

5           school.  The school is not accredited.  It's

6           licensed.

7              They could not pass a New England

8           accreditation process, nor does the city want

9           them to because then they would have to

10          provide everything they're supposed to

11          provide in the accreditation process, which

12          would mean more money.  It's just a whole

13          total different animal as far as the

14          administrative structure within a School

15          Department.

16     Q.   How about can you tell me a little bit about

17          the differences, if any, between the duties

18          and responsibilities of the Principal of

19          Wilby High School as compared to the duties

20          of the Principal of the Adult Education

21          Program?

22              MR. ZAYOTTI:  Objection.

23     A.   Well, the duties is very simple.  I had 110

24          certified teachers and 65 paraprofessionals

1        at Wilby High School.  I had a building that

2        had been built $28 million, in that range

3        someplace.  26, $28 million.  It was a huge

4        facility.  It was on 50 acres of land.  So I

5        had ball fields outside.  Inside I had a

6        gymnasium with three basketball courts.  It

7        was the largest gymnasium, one of the largest

8        in the state.

9            Now I have a facility that's leased.  I

10       have only three contracted teachers.  The

11       rest of the people are retired people that

12       I've recruited and are paid on an hourly

13       basis, according to the teacher's contract,

14       that they have no contract, no benefits.

15       There are some people there that are not

16       retired that have been, why they've stayed

17       down there I don't know.

18           It's, it's apples and oranges.  I mean, if

19       someone says, You're doing what?  To the

20       common public, it's, you go along and have a

21       survey on the street, they're going to tell

22       you which one is a higher position and that's

23       the way the people are, treat you.

24   Q.    (By Mr. Zayotti)  I think I'm getting a

1          picture.  Just to clarify, was the position

2          of Principal of the Adult Education Program

3          created, essentially, for you?

4     A.   Yes.

5     Q.   With regard to your divorce and the

6          introduction of the, at least the specter, or

7          the specter, I think you testified earlier

8          you weren't sure if it actually got

9          introduced into evidence, but is it fair to

10         say that the, you and your attorney were

11         aware that your ex-wife's attorney was in

12         possession of the police report relating to

13         the, what I'll call the Yarmouth incident?

14              MR. CAMPBELL:  Objection.  Are you asking

15         if he was aware that Mr. Mahaney had the

16         police report?

17    Q.   (By Mr. Zayotti)  I'll start over.  Were you

18         and your attorney aware that Mr. Mahaney had

19         the police report relating to the Yarmouth

20         incident?

21    A.   Very aware.  Number one, from the letter he

22         wrote to Attorney Potash and, number two, he

23         waved it in our face in the courthouse.

24    Q.   And when did that happen?

1          Mr. Lombardo.

2              If I tell him something in this room, two

3          weeks from now I'm going to hear it from

4          another group of people and it's going to be

5          expanded upon.  He's not the type of

6          individual that would deal with confidential

7          information, in my opinion, in a confidential

8          manner.

9              I found it very interesting that, how did

10         he get it.  And he got it on a Saturday,

11         after looking that, the date book, which is

12         another interesting aspect.  He works Monday

13         through Friday.

14             So it's a mystery to me how someone in

15         South Yarmouth could get

16         Mr. Lombardo's name.  He's not listed in the

17         state directory for school employees, which

18         is the State of Connecticut puts out.  How

19         would someone at Yarmouth Police Department

20         pick Mr. Lombardo?  He doesn't work in the

21         superintendent or police office.

22    Q.   Let me ask you this: Did the disclosure of

23         the Yarmouth Police report affect how you

24         responded to criticisms in the accreditation

1      report?

2   A.   Definitely.  I was totally intimidated to

3      open it up to the public, and Dr. Snead knew

4      he had me in that position.  If, if that

5      hadn't occurred, my M.O., or my way I

6      administrate, is I would have been right out

7      there in front of the public fighting for my

8      reputation.

9        In this situation, I was advised both by

10     Attorney Gesmonde and Attorney Potash,

11     "Marty, don't do it.  They will destroy you."

12   Q.   I'm going to show you, I only have one copy

13     of this, but I'm going to show you the

14     printout of a record from the Massachusetts

15     Superior Court website which I believe is a

16     copy of the docket entries relating to your

17     litigation with the Nickinellos.  Do you see

18     at the top there where it says Galvin v.

19     Nickinello?

20   A.   Yes.

21   Q.   Let's see.  Is there a docket number anywhere

22     there?  Would you have any recollection of

23     what the docket number on that case was?

24   A.   No, I don't.

## *EXHIBIT B*

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
BARNSTABLE COUNTY DIVISION

| | | |
|---|---|---|
| MARTIN J. GALVIN and | * | CIVIL ACTION NO. |
| CYNTHIA A. GALVIN, | * | |
| Plaintiffs | * | MOTION FOR ENDORSEMENT OF |
| | * | MEMORANDUM OF LIS PENDENS |
| vs. | * | |
| | * | |
| LOUIS R. NICKINELLO and | * | |
| PATRICIA R. NICKINELLO | * | |

Plaintiffs, Martin J. Galvin and Cynthia A. Galvin hereby move this Honorable Court for endorsement upon the accompanying Memorandum of Lis Pendens. Plaintiffs commenced the above-entitled action against the Defendants, Louis R. Nickinello and Patricia R. Nickinello, Individually and as tenants by the entirety as owners of property located at 47 Mattachee Road, South Yarmouth, Barnstable County, Massachusetts on the 5th day of November, 1999. Said complaint affects the title of a certain parcel of developed land in South Yarmouth, County of Barnstable, Massachusetts, as more fully described in the Memorandum of Lis Pendens. Accordingly, Plaintiffs respectfully move this Honorable court for an endorsement upon the Memorandum of Lis Pendens in order that the same may be filed with the Registry of Deeds pursuant to Chapter 184, Section 15 of the Massachusetts General Laws.

MARTIN J. GALVIN and
CYNTHIA A. GALVIN,
Plaintiffs,
By their Attorney,

Edward W. Pietnik, Jr., Esq.
P.O. Box 586
Raynham Center, MA  02768
Tel. No. (508) 824-2000
BBO#:  550523
November 5, 1999

KW00178

## *EXHIBIT C*

 

## COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss

FIRST DISTRICT COURT
DOCKET NO:
0025CV 0445

LOUIS R. NICKINELLO and ]
PATRICIA R. NICKINELLO ]
            Plaintiffs ]
v. ]                                    COMPLAINT
 ]
MARTIN J. GALVIN and ]
CYNTHIA A. GALVIN ]
            Defendants ]

NOW COME the plaintiffs, Louis R. Nickinello and Patricia R. Nickinello, (collectively, "Mr.& Mrs. Nickinello") and herein file the following Complaint as set forth below against the defendants, Martin J. Galvin and Cynthia A. Galvin (collectively, "Mr. & Mrs. Galvin").

1.   The Plaintiffs, Mr. & Mrs. Nickinello, are a married couple residing in the Commonwealth of Massachusetts at 113 Pleasant Street, South Yarmouth, County of Barnstable, Massachusetts.

2.   The Defendants, Mr. & Mrs. Galvin, are a married couple residing at 21 Coniston Avenue, Waterbury, Connecticut.

3.   Mr. & Mrs. Nickinello are the owners of a home located at 47 Mattachee Road, South Yarmouth, County of Barnstable, Massachusetts. (hereinafter, the "Subject Property")

4.   In 1995, Mr. & Mrs. Nickinello rented the subject property to Mr. & Mrs. Galvin who continued to rent said subject property until January, 2000.

5.   On or about December 31, 1999, Plaintiffs were awarded Judgment for possession pursuant to a summary process action filed in the Barnstable First District Court, docket number 9925SU1263. A copy of the Notice of Judgment is attached hereto as Exhibit "A".

6.   On or about January 15, 2000, following issuance of Judgment for possession of the subject property, the defendants vacated the subject premises by removing therefrom certain items of personal property owned by said defendants.

7.   On or about January 15, 2000, the defendants also removed from the subject property certain items of personal property owned by the plaintiffs, a list of which is attached hereto as Exhibit "B".          KW00257

MAY 0 4 2000

8.  The items of personal property owned by the plaintiffs were used by the defendants during the course of their tenancy but remained the personal property of the plaintiffs.

9.  Despite repeated demands for the return of the items taken by the defendants, as evidenced by letters from counsel for the plaintiffs to counsel for the defendants, the items taken by the defendants have not been returned.

COUNT I
CONVERSION

10. Plaintiffs herein repeat and reaver all statements and allegations set forth in paragraphs 1-9 inclusive as if set forth in their entirety herein.

11. On or about January 15, 2000,  the defendants converted to their own use the property of the plaintiff mentioned in the schedule hereto annexed and marked Exhibit "B".

12. Despite demand, said items have not been returned and the defendants continue to intentionally exercise dominion over the plaintiff's property.

WHEREFORE, the Plaintiffs respectfully demand judgment against the Defendants in the amount of $3,815.00 plus interest thereon since the date of conversion, plus reasonable costs, including attorney fees incurred in this action.

COUNT II
BREACH OF CONTRACT FOR STORAGE

13. Plaintiffs herein repeat and reaver all statements and allegations set forth in paragraphs 1-12 inclusive as if set forth in their entirety herein.

14. This action is brought pursuant to M.G.L. c. 186 § 3.

15. On or about January 15, 2000, defendants vacated the subject premises following termination of their lease.

16. After vacating the subject premises, the defendants left a number of items of personal property behind, including a boat and trailer stored on the subject property.

17. As a result of defendant's failure to remove said items of personal property upon vacating the subject property, plaintiff's have been forced to remove said items and have them stored at plaintiffs' expense.

18. Notice of such action and subsequent storage has been given to the defendants who have not

KW00258                    - 2 -

MAY 0 4 2000



objected thereto.

19. Since notice of such storage was given to defendants, said defendants have made no effort to have such items removed from storage nor to compensate the plaintiffs for costs incurred.

20. Pursuant to M.G.L. c. 186 § 3, a tenant who does not remove his property from hired premises after the termination of a tenancy is liable to owner for expenses of storage.

21. Defendants have failed to pay such expenses incurred by plaintiffs.

WHEREFORE, the Plaintiffs respectfully demand judgment against the Defendants in an amount determined by the court to be reasonable, plus interest thereon since the date of breach, plus reasonable costs, including attorney fees incurred in this action.

## JURY DEMAND

The Plaintiffs hereby demand a trial by jury on all counts so triable.

Respectfully Submitted,
Plaintiffs, by their attorney,

Donald H. Mason, Esq.
MASON & BROIDRICK P.C.
490 Main Street - P.O. Box 709
Yarmouthport, MA 02675
508-375-0369
BBO # 562291

Dated: May 3, 2000

KW00259

MAY 0 4 2000

- 3 -

## COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss

FIRST DISTRICT COURT
DOCKET NO:

LOUIS R. NICKINELLO and ]
PATRICIA R. NICKINELLO ]
     Plaintiffs ]
v. ]    AFFIDAVIT OF MILITARY SERVICE
  ]
MARTIN J. GALVIN and ]
CYNTHIA A. GALVIN ]
     Defendants ]

I, Donald H. Mason, Esquire, on oath depose and state that, based upon information and belief the defendants are not in the military service of the United States or any of its Allies, as defined in the Soldiers' and Sailors' Civil Relief Act, of 1940, as amended, but is now adult residents of 21 Coniston Avenue, Waterbury, Connecticut.

The plaintiff further deposes that the defendant are not infants or incompetent persons.

Subscribed and sworn this the 3rd day of May, 2000.

Donald H. Mason, Esq.
MASON & BROIDRICK, P.C.
490 Main Street - P.O. Box 709
Yarmouthport, MA 02675
(508) 375-0366
BBO# 562199

Dated: May 3, 2000

MAY 0 4 2000

KW00260

## *EXHIBIT D*



# YARMOUTH POLICE DEPARTMENT

## OFFICER'S REPORT

Original CFS#: 2001014939     Actual Offense: THREAT TO COMMIT CRIME

| | | |
|---|---|---|
| Date Received: 05-Jul-01   Thu | Name of Place: | St#: Address: |
| Time Received: 9:43 AM | | 424   Route 28 |

Additional Offenses

MAL DESTRUCTION/VANDALISM

Suspect Name(s):

**Officer Responding**    Time Dispatched:   Time Arrived:   Time Cleared:

Sgt. K. McIsaac                                 9:44 AM

**Narrative:**

On this date I was discussing with Officer Nickinello the incident involving the suspect and the events that led up to him being placed into protective custody last night at approx. 2000 hrs (incident #2001014887). I advised Officer Nickinello to file a written complaint regarding it. He relayed the following information to me.

At approximately 1930 hours Officer Nickinello was off-duty at home. He was cooking food on his barbecue grill in the back yard with his two daughters, Francesca (age 9) and Paige (age 8). He heard a loud banging noise coming from the north side of his property on the other side of his fence. This fence separates his property with that of his neighbor's: Joe Petruzzi, 41 Mattachee rd. Officer Nickinello went to see what it was and saw the suspect, Martin Galvin, striking the fence with an object later identified as a white plastic lawn chair belonging to Mr. Patruzzi. He recognized Mr. Galvin from being a former neighbor and family friend. He yelled to Mr. Galvin to stop hitting the fence. Mr. Galvin replied be yelling back: "fuck you, fuck you Lou." He continued to yell at Officer Nickinello such things as "I'll get you. You will get yours. Fuck you." Officer Nickinello told him to stop swearing in front of his daughters. Mr. Galvin replied by saying: I don't care about your goddamn daughters." Officer Nickinello reminded Mr. Galvin that he is a principal and that she should respect himself and his position and go home. Mr. Galvin stated " Fuck my position." He continued to swear at Officer Nickinello and blaming him for ruining his life. Officer Nickinello told Mr. Galvin to go home or he would call the police. Two neighbors, Robert Gigilo of 44 Mattachee Rd and Alfred Oshea of 50 Mattachee Rd heard the disturbance and came over to try to calm Mr. Galvin down and get him to go home. Mr. Galvin said "fuck you" to them as well. At about this point, Mr. Galvin's brother, Dennis Galvin approached from his rental home on the next street over on Eldridge Rd, directly behind 41 Mattachee Rd. Mr. Giglio and Mr. O'Shea told Dennis to bring his brother home. Officer Nickinello reported the incident to the police. Officer Tom Hennessey and David Dickey responded to investigate. They went to Eldridge Rd to speak to Martin Galvin. They found him in a highly intoxicated state in the front yard and placed him into protective custody.

Mr O'Shea later told Officer Nickinello that Martin Galvin had showed up, highly intoxicated, and uninvited at a 4th of July party he was having at his house at 50 Mattachee Rd. Mr. Giglio saw Mr. Galvin hitting the fence with a plastic patio chair. There was only minor damage in the form of gouges in the fence, owned by Louis Nickinello Sr. But the lawn chair was destroyed. Mr. Patruzzi, the owner of the chair was called at his home in Connecticut and informed of the damage.

The animosity demonstrated by the suspect is believed to stem from a civil action over the property at 47 Mattachee rd between Mr. Galvin and Louis Nickinello Sr, that was settled in court in Mr. Nickinello's favor. Throughout the two year period in which the civil proceeding went on, there were numerous other incidents of vandalism and malicious destruction to properties owned by Mr. Nickinello Sr.

Officer Writing Report:                                             Date of Report:

Signature:

Copyright 1996-97 - Innovative Management Consulting

*EXHIBIT E*



# YARMOUTH POLICE DEPARTMENT

## OFFICER'S REPORT

Original CFS#: 2001014887    Actual Offense INTOXICATED PERSON

| Date Received: 04-Jul-01    Wed | Name of Place: | St#: Address: |
|---|---|---|
| Time Received: 7:54 PM | | Mattachee Rd |

Additional Offenses                              Suspect Name(s):

| **Officer Responding** | Time Dispatched: | Time Arrived: | Time Cleared: |
|---|---|---|---|
| Off. T. Hennessey | 7:55 PM | 8:03 PM | 8:12 PM |

**Narrative:**

On the above date and time, while on patrol I was dispatched to 47 Mattachee Rd in South Yarmouth, the residence of Louis Nickinello Jr. Louis Nickinello reported that a neighbor, Martin Galvin, was intoxicated and causing some type of problem in the neighborhood. Patrol Officers of YPD have previously been advised of ongoing problems the Nickinello family have been having with Mr. Galvin.

I arrived at the Nickinello residence a few minutes after being dispatched. I entered the residence and spoke with Louis Nickinello Jr. who gave the following version of the incident:

Lou and his two daughters, ages 9 and 8, were in their back yard while Lou was cooking on the barbecue gr    He heard a banging noise coming from the side of his yard and looked over to see Martin Galvin standing on the other side of a fence. Galvin was striking the fence. At the time, Lou Nickinello was unsure if Mr. Galvin was kicking the fence, punching it, or using some object to strike it. From where we were standing in the Nickinello yard, we did not see any damage to the fence. ( See Sgt. McIsaac's report, incident # 20010114939 regarding damage ). Lou yelled to Mr. Galvin to stop hitting the fence, at which time Mr. Galvin responded by yelling "Fuck You" repeatedly. Lou Nickinello's daughters were still present and heard Mr. Galvin's cursing, as well as his threat " I'll get you...you'll get yours". Other residents of the neighborhood came out and attempted to get Mr. Galvin to return to his family's house on Eldridge Rd, one street over from Mattachee Rd. Mr. Galvin then walked through yards to return to Eldridge Rd. Lou Nickinello advised that Mr. Galvin appeared highly intoxicated.

I then left the Nickinello residence and drove to Eldredge Rd to speak with Mr. Galvin. As I turned onto Eldredge Rd I observed Martin Galvin and his elderly mother standing at the roadside a few houses down from their own house. I drove up to them, parked my cruiser, exited and approached them. Mr. Galvin did indeed appear very drunk, swaying side to side while standing in place. His eyes were glassy and there was a strong odor of alcoholic beverage coming from his person. I asked Mr. Galvin if he had threatened Lou Nickinello and he claimed he did not. I asked him if he swore at him and he again claimed that he did not. Mr. Galvin's speech at this time was very thick-tongued and slurred. As I was speaking with Mr. Galvin, his mother stated to me " This is a family problem...we'll take care of it." Also, as I was speaking with Martin Galvin, his brother Dennis Galvin approached us. Dennis Galvin stated that their family would take care of Martin Galvin. I stated to the Galvin family that they had not done a proper job of keeping Martin Galvin under control prior to my arrival, and that I had serious doubts about their ability to control Martin Galvin's behavior for the rest of that evening. I informed them that Martin was highly intoxicated, had already caused one disturbance and was so intoxicated th   felt he was a threat to himself or someone else. I reached my right hand towards Martin Galvin, took hold of his left arm and informed him that I was placing him in protective custody. Dennis Galvin began to reach towards me and stated " No, don't do that." Dennis proceeded to step towards me until he was approximately 2 feet away from me. It was obvious that Dennis was unhappy with the course of action I had decided to take. He

reached out and put a hand on my arm. Immediately, in a loud and authorita voice informed Mr. Dennis Galvin that if he attempted to touch me or interfere with me I would immediately arrest him. Although he was hostile towards me during this incident, Dennis Galvin did not at any time show any signs of intoxication.

After Martin Galvin was handcuffed Dennis Galvin stated " That little prick…" which I believe was a reference to Lou Nickinello Jr. He further stated that he would be contacting his lawyer. I informed the Galvins that Martin w֙   ֙be released when he was sober. R.O. Holmes transported Mr. Galvin to YPD.

I then returned to the Nickinello residence to advise Lou of the situation. Lou Nickinello JR stated that he feared that Mr. Galvin would attempt some type of retribution because of this. At the time, both Lou Jr. and I were unaware of the property damage, thus no further action was taken.

Officer Writing Report:

Signature ___T. Ibeu___

Date of Report:

8/1/01

## *EXHIBIT F*

508-862-2721

p. 1

424 Route 28, West Yarmouth, MA 02673
Phone  508.775.0445 ext. 115
Fax  508.862.2721

**Office of the Chief
Yarmouth Police
Department**

# Fax



To: *Mr. Frank Lombardo*  From:  Chief Peter L. Carnes  /*Lt. Xiarhos*

Fax:                                          Pages:  *9*

Phone:                                        Date:

Re:  *Martin J. Galvin Jr*

☐ Urgent   ☑ For Review   ☐ Please Comment   ☐ Please Reply   ☐ See Attached

• Comments:

*CONFIDENTIAL*

## ***LAW ENFORCEMENT USE ONLY***

The documents accompanying this fax transmission contains information
from the Yarmouth Police Department which may be CONFIDENTIAL AND/OR
PRIVILEGED. The information is intended to be for the use of the individual or
entity named on this transmittal sheet. If you are not the intended recipient, be
aware that any misuse of this information is strictly PROHIBITED.

## "COMMITTED TO OUR COMMUNITY"

KW0079

JUL 06 '01 02:39p      YARMOUTH POLICE DEPT        508-862-2721        P



# YARMOUTH POLICE DEPARTMEN

### "Committed To Our Community"

424 Route 28 West Yarmouth, Massachusetts 02673-4796
Telephone (508) 775-0445 - Fax (508) 775-4997
www.yarmouthpolice.com

Peter L. Carnes
Chief of Police

### Steven G. Xiarhos
Lieutenant

TO: All Sergeants and Officers
FROM: Lt. Steven Xiarhos
RE: MARTIN J. GALVIN JR.
DATE: 7/5/01

**CONFIDENTIAL**

## INCIDENT SYNOPSIS

Martin J. Galvin Jr. has been harassing the Nickinello family again. On Wed 7/4/'01 at 1930, Galvin went to Patrol Officer Nickinello's home and made threats and vandalized some property. Galvin was heavily intoxicated and was verbally abusive to both of Patrol Officer Nickinello's daughters.

YPD responded and placed Galvin in protective custody.

Galvin is an alcohol abuser with 2 previous OUI arrests by YPD.

Please keep watch of the Nickinello property and be alert for Mr. Galvin.

See report 2001014939 7/4/01 for additional details.

Waterbury PD contacted. Galvin is Wilby High School principal in Waterbury.

## DESCRIPTION OF SUBJECT

MARTIN J. GALVIN JR. WM AGE 56
5-10 180 SALT/PEPPER HAIR AND BEARD
21 Coniston Ave Waterbury, CT

Possible Local Address:
Room 2 Riverview Annex SY
46 Eldredge Rd. SY

Galvin has *no* active MA or CT driver license

Galvin has active CT License to Carry

KW0080

CFS#: 2001014887

TYAR

209A Involved?:

Citation #

Arr. Location Eldridge Rd South Yarmouth

# Yarmouth Police Department
## Protective Custody

Arrest Date: Arrest Tim
7/4/01          20:15

Booking Date / Time:
7/4/01          20:18

Inc Location: Mattakesse Rd South Yarmouth

| | | | |
|---|---|---|---|
| Last Name: **Galvin** | First Name: **Martin** | Middle Name **Joseph** | Age **56** |

Alias: **None**

Birthplace: **Waterbury Ct**

Address: **21 Coniston Ave**

City: **Waterbury**

State: **CT**

SSN: **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**    DOB: **3/6/45**

Phone: **(203) 753-5390**    Zip: **06708**

ID Marks: **Dark birthmark on left leg**

Other Description:

Glasses?:

Clothing: **Tee Shirt,Dockers**

MaritalStatus: **Separated**

Race: **White**

Gender: **Male**

Complexion: **Fair**

Hair: **White**

Facial Hair: **Mustache**

Eyes: **Blue**    Build: **Medium**    Handed: **Right**    Ht: **5-10**    Wt: **180**

Gang Affiliation **none**

Medication Prescribed: **zentel**

CONFIDENTIAL

No Picture

nopix.bmp

Mother's Maiden Name: **Joyce**

Father's Name: **Martin**

Spouse:

Property:

**Brown Wallet With Contents, Pager, Brown Belt, Shoes**

Paper Money **$150.00**

The above is the list of my property:

I have received the above listed property:

Arresting Officer: **Off. T. Hennessey**

Reporting Officer: **Off. T. Hennessey**

Booking Officer: **Off. C. Zahigian**

Searched By: **Off. C. Zahigian**

Put In Cell By: **Off. C. Zahigian**

Cell#: **1**

Informed Of Rights:

Fingerprinted?: **No**

Breathalyzer Given? **Yes**

Results: **.21/.15/.21**

Breathalyzer Operator: **Sgt. F. Hennessey**

Have you ever attempted Suicide? **n o**

Are you contemplating suicide now? **No**

Copyright 1998-2000 Innovative Management Consulting, Inc. Page 1 of 2   Yarmouth Police Department Arrest Report #   2001014887

| Detox Notified?: | Taken to Detox?: | Detox Telephone Number: |
|---|---|---|
| Yes | No | 771-6640 |

| Injured | Type of Injury | Offered Med Atten | Name of Hospital: | Type of Force?: Injury Due to Forc |
|---|---|---|---|---|
| No | | | | |

| Occupation: | Company Name: | Work/School Address: | School/Work Phone: |
|---|---|---|---|
| High Principal | Wilby H>s | Waterbury, Ct | (203) 574-8102 |

Ch. 276-33a Right to a telephone: The police official in charge of the station or other place having a telephone wherein the person is held in custody, shall permit the use of the telephone at the expense of the arrested person, for allowing the arrested person to communicate with his/her family or friends, or arrange for release on bail, or engage the services of an attorney. Any such person will be informed forthwidth upon his arrival at such station or place of detention, of his right to use the telephone, and shall be permitted within one hour thereafter.

I have been advised of my rights to use a phone.

PhoneUsed:  PhoneUsedTime:
No

The Yarmouth Police Department will not hold a juvenile for court if the period of his/her detention will exceed six (6) hours. If the juvenile is ordered to be held for more than six (6) hours, a juvenile detention facility must be called and the juvenile must be transported accordingly. There are NO EXCEPTIONS to this rule.

## JUVENILE DATA

| Adult Notified | Relationship: | Adult Address: | Adult Phone: |
|---|---|---|---|
| | | | |

| Notified By: | Date: | Time: | Juvenile Probation Officer: | DSS: |
|---|---|---|---|---|
| | | | | |

| Date Juv. Placed in Cell: | Time Juv. Placed in Cell: | Date Juv. Out of Cell: | Time Juv. Out of Cell: | Total Time: |
|---|---|---|---|---|
| | | | | |

| BOP Done?: | Q2 Results: | Q5 Results: | Q5 Number: | Court: |
|---|---|---|---|---|
| | | | | |

| Disposition: | Bailed By/Released To: | Released By: | Date Released: | Time Released: |
|---|---|---|---|---|
| Released | | RAM 1593 | 7/5/01 | 0900 |

Comments At Time of Booking:

CONFIDENTIAL

KW0082

Copyright 1998-2000 Innovative Management Consulting, Inc. Page 2 of 2   Yarmouth Police Department Arrest Report #    2001014887



GALVIN, MARTIN J   7-4-01
# 2001017887

CONFIDENTIAL

KW0083

| Date Rec. | Time Rec. | CFS# | Dispatcher | Shift Supervisor | Shift |
|---|---|---|---|---|---|
| Jul 04,2001 | 19:54 | 2001014887 | Off. D. Mason | Sgt. F. Hennessey | E |

| Code | Reported Incident | Actual Incident | How received? |
|---|---|---|---|
| 650 | INTOXICATED PERSON | INTOXICATED PERSON | |

**Name of Place**

**Street #**   **Name of Street**   Mattachee Rd   **Apt**   **Phone**

| Unit | Primary Officer | Dispatch Time | Arrival Time | Cleared Time | Disposition |
|---|---|---|---|---|---|
| 8 | Off. T. Hennessey | 19:55 | 20:03 | 20:12 | |
| Unit 2 | Back Up #2 / Off. D. Dickey | 19:55 | 20:03 | 20:12 | |
| Unit 3 | Back Up #3 / Res. Off. R. Holmes | 20:12 | 20:12 | 20:12 | |
| 17 | | | | | |
| 22 | | | | | |

**Notification**   **Priority**   3

**Comments**

Martin Galvin and Dennis Galvin in area intoxicated and making threats to cause damage to property at 45 and 47 Mattachee Road. Martin Galvin taken into PC and Dennis Galvin issued trespass warning.

**Arrest Data : Name; Address; Charges**

**Incident Reference Number:**

Zip   02673

Copyright 1997-99 - Innovative Management Consulting, Inc.    Yarmouth Police Department Incident Report # 2001014887

CONFIDENTIAL

KW0084

## *EXHIBIT G*

# Waterbury Public Schools

**236 Grand St., Waterbury, Ct. 06702**
**(203)574-8004 Fax (203)574-8010**



*David L. Snead, Ph.D*
*Superintendent*

## CONFIDENTIAL

July 10, 2001

<u>Via Certified and First Class Mail</u>

Martin J. Galvin, Ed.D.
21 Coniston Avenue
Waterbury, CT 06708

Dear Dr. Galvin:

On Friday, July 6, 2001, I was notified that the Yarmouth, MA. Police Department had arrested you for threatening and for malicious destruction/vandalism.

The Yarmouth police have reported to us that on or about 7:30 p.m. on July 4, 2001, you went to the home of a former neighbor, and made threats to him in front of his children aged 8 and 9. These threats included the use of abusive and profane language. It is further reported you were heavily intoxicated and that you vandalized property including a fence and patio chair.

As a result of this conduct, police were called and you were arrested and placed into protective custody. Please be advised that these criminal charges, if true, result in questions relative to your employment in the Waterbury Public Schools.

I would like to give you an opportunity to discuss this matter as soon as possible. Please contact me when you receive this letter to arrange a meeting. You are entitled to SAW representation at this meeting if you so choose.

Very truly yours,

David L. Snead, Ph.D.,
Superintendent of Schools

DLS/bb

KW0085

## *EXHIBIT H*

CONFIDENTIAL

# SETTLEMENT AGREEMENT

This Settlement Agreement, dated June 11, 2003, is made by and among the School Administrators of Waterbury (hereinafter, "SAW"), Dr. Martin J. Galvin (hereinafter, "Dr. Galvin"), and the Waterbury Board of Education (hereinafter, "Board") in light of the following circumstances:

**WHEREAS,** on or about April 30, 2002, SAW filed grievance #2001-2002-06, alleging that the Superintendent of Schools had arbitrarily and capriciously transferred Dr. Galvin from his longstanding position as principal of Wilby High School to a position of principal of the Waterbury Adult Education Program;

**WHEREAS,** the Board denies that it violated the collective bargaining agreement as alleged by SAW in the grievance;

**WHEREAS,** the Board and SAW desire fully and finally to settle this grievance;

**NOW, THEREFORE,** in consideration of mutual promises and covenants contained in this Agreement, the Board and SAW agree as follows:

1. Said grievance shall be withdrawn by Dr. Galvin and SAW with prejudice;

2. The Board shall not reduce Dr. Galvin in status or pay (except as may otherwise be permitted by State statute for competency or discipline reasons) during the 2003-2004, 2004-2005, and 2005-2006 school years;

3. This Settlement Agreement shall neither be asserted by the other party as a precedent or past practice in the future if similar circumstances arise, nor shall it be considered to constitute an amendment to the parties' current collective bargaining agreement. Further, SAW agrees that the Board has the right to involuntarily transfer administrators pursuant to Article VII, Section 1, provided such transfer results in no reduction of pay or status;

4. Dr. Galvin understands that he is responsible for the oversight of the entire Adult Education program, and that he shall attend a meeting with the Superintendent of Schools, David Snead; Assistant Superintendent, Paul Sequeira; Chief Operating Officer, Paul Guidone; and Board President, Mary White, to discuss job expectations.

SCHOOL ADMINISTRATORS
OF WATERBURY

By: _____
Forest Belval, Its President

Date: ___6/11/03___

WATERBURY BOARD OF EDUCATION

By: _____

Date: ___6/11/03___

DR. MARTIN J. GALVIN

_____

Date: ___6-11-03___

CONFIDENTIAL

## *EXHIBIT I*

# Waterbury Public Schools

### 236 Grand St., Waterbury, Ct. 06702
### (203)574-8004 Fax (203)574-8010

*David L. Snead, Ph.D*
*Superintendent*

DATE:      May 20, 2002

TO:        Martin Galvin, Ed.D.,
           Principal, Adult Education

FROM:      David L. Snead, Ph.D.,
           Superintendent of Schools

SUBJECT:   Statement of reasons for your involuntary transfer from Principal, Wilby High
           School to Principal, Adult Education.

This memorandum responds to your memo dated April 29, 2002 requesting a written statement of the reasons for the implementation of the above-referenced transfer. My decision to transfer you was made for the best interests of the school system. In light of the recent report of the New England association of Schools and Colleges, it has become evident to me that a change in leadership was necessary at Wilby High School.

The NEASC reports describes the following concerning the leadership and organization of Wilby High School:

1. Lack of vision and leadership at the school.
2. Teachers' perception that they are left out of the decision-making process.
3. Lack of regularly scheduled faculty meetings.
4. The length of time that it takes to resolve student scheduling conflict.
5. Lack of teacher collaboration across departments.
6. Lack of acknowledgement of teacher's accomplishments.

I recognize that many other deficiencies were cited in the NEASC report that may not be directly related to the school's leadership.

Nonetheless, I share some of these same concerns about Wilby High School's leadership and I feel your skills are better suited to the Adult Education Program, which has been without a permanent principal for over a year.

DEFENDANT'S
EXHIBIT
14
LAB    2.8.6

Wtby000274