# SUPPLEMENT TO EXHIBIT 4

Page 1

1      UNITED STATES DISTRICT COURT
2        STATE OF MASSACHUSETTS
3
4   Civil Action 04-11958-RGS        ORIGINAL
5   ---------------------------------------------
6   MARTIN J. GALVIN, JR., Ed.D.,
7
8        Plaintiff,
9
10       vs.
11
12  THE TOWN OF YARMOUTH,
13  PETER L. CARNES AND
14  STEVEN XIARHOS,
15
16       Defendants.
17  ---------------------------------------------
18
19              DEPOSITION
20                 OF
21         DAVID L. SNEAD, Ph.D.
22
23        Waterbury, Connecticut
24        Wednesday, February 8, 2006

```
 1            (The last question was read
 2       by the reporter.)
 3   A.  Vaguely.  I'm not sure that I can recall if
 4       Dr. Galvin asked that question or if one of
 5       his representatives asked that question.
 6   BY MR. CAMPBELL:
 7   Q.  Was there any discussion about the
 8       propriety or legality of the Yarmouth
 9       police having disclosed or disseminated
10       that information?
11   A.  I don't recall that.
12   Q.  Ultimately, did you institute any
13       disciplinary negative job action against
14       Dr. Galvin resulting from that incident?
15   A.  None other than a verbal advisement that he
16       should be very careful to avoid this kind
17       of behavior in the future.
18   Q.  Did you give him that advice at the
19       conclusion of that meeting itself or at
20       some later time?
21   A.  I believe -- well, I don't remember, to
22       tell the truth.  I don't remember whether
23       it was at a later date or at the end of
24       that meeting.  My normal behavior is to let
```

Page 49

```
 1       any individual know that I will get back to
 2       them in a timely fashion with my
 3       recommendation.
 4   Q.  Did any administrator or supervisor or
 5       authority of any description in Waterbury
 6       discipline or reprimand or take any
 7       negative action towards Dr. Galvin because
 8       of that incident on July 4th of 2001?
 9   A.  No.
10   Q.  Was it your decision about the action that
11       you took affected by the circumstances
12       under which you became aware of the
13       incident?
14   A.  Repeat that.
15   Q.  That's a bad question.
16                Did you have an opinion as to
17       whether it was proper or legal for the
18       Yarmouth police to disseminate that
19       information?
20   A.  No.
21   Q.  Did that question enter into your mind when
22       determining what action you were going to
23       take with respect to Dr. Galvin?
24   A.  No.
```

```
 1   Q.   Doctor, is there a written code of conduct,
 2        any type for school department employees?
 3   A.   No.
 4   Q.   Is there guidelines regarding school
 5        department employees with respect to
 6        illegal or unethical or improper behavior
 7        that's in writing that you are aware of?
 8   A.   No.
 9   Q.   Do you know whether any such writings with
10        respect to the City of Waterbury employees
11        as a whole exist?
12   A.   I'd only be guessing.  It could be in the
13        charter.  But no.
14   Q.   Do you know whether the union contract with
15        SAW, School Administrators of Waterbury,
16        has any such provisions, code of conduct
17        guidelines?
18   A.   I would have to review the contract to
19        answer that question.
20   Q.   As you sit here today, you are not aware of
21        any such provisions?
22   A.   Correct.
23   Q.   Is it fair to say that this incident was
24        closed in or around July of 2001?
```

Page 51

1  A.  Yes.
2  Q.  No further action was taken after July of
3      2001?
4  A.  None.
5  Q.  Subsequently in April of 2002, the New
6      England Association of Schools and Colleges
7      issued a report with respect to Wilby High
8      School; is that correct?
9  A.  Correct.
10 Q.  Doctor, what is the New England Association
11     of Schools and Colleges?
12 A.  It's an accrediting agency that school
13     systems volunteer to join, and it helps to
14     review curriculum, building maintenance
15     facilities, media centers, all of what goes
16     on in the school to determine whether or
17     not it can be recommended as an accredited
18     school by this agency.
19 Q.  Wilby High School received an accreditation
20     report from NEASC in April of 2000;
21     correct?
22 A.  Correct.
23 Q.  What was the substance of their
24     determination?

```
 1        Trustees, NEASC was released in April of
 2        2002; isn't that correct?
 3   A.   Correct.
 4   Q.   And Wilby failed all seven portions of the
 5        accreditation process; correct?
 6   A.   Correct.
 7   Q.   What action did you take with respect to
 8        Dr. Galvin in response to that?
 9   A.   I removed Dr. Galvin from the principalship
10        of Wilby High School and transferred him to
11        the vacancy of principal at the adult
12        education center.
13   Q.   What were your reasons for making that
14        transfer, Doctor?
15   A.   There was a need for a change in leadership
16        at Wilby High School.
17   Q.   Were there any other reasons for that
18        transfer?
19   A.   No.
20   Q.   You made that determination.
21             Did you have to get approval
22        from the Board of Education to execute it?
23   A.   No.
24   Q.   It's completely within your discretion to
```

Page 65

```
 1         make a transfer?
 2    A.   Correct.
 3    Q.   Did you discuss that action with the Board
 4         of Education?
 5    A.   Yes.
 6    Q.   Did you discuss it beforehand?
 7    A.   Yes.
 8    Q.   When you discussed this transfer with the
 9         Board of Education, did you mention or
10         discuss the July 2001 incident in Yarmouth,
11         Massachusetts?
12    A.   No.
13    Q.   Did that come up at all during your review
14         of the situation with the Board of
15         Education?
16    A.   No.
17    Q.   In your view, was it a consideration at all
18         in your determination to transfer
19         Dr. Galvin?
20    A.   No.
21    Q.   I'll ask the same question in a different
22         way.
23              You responded to the
24         accreditation failure by removing
```

Page 66

```
 1        Dr. Galvin from the principalship; right?
 2   A.   Correct.
 3             MR. CAMPBELL:  Let's mark this.
 4                  (Defendants' Exhibit 11
 5        marked for identification.)
 6   BY MR. CAMPBELL:
 7   Q.   We will go back over something that was
 8        just raised, Dr. Snead.
 9             In addition to transferring
10        Dr. Galvin, you and the Waterbury school
11        department took a number of other actions
12        to respond to the accreditation issue at
13        Wilby; correct?
14   A.   Correct.
15   Q.   This was a situation that was taken very
16        seriously by you, wasn't it?
17   A.   Correct.
18   Q.   I want to show you Exhibit 11.  That is a
19        newspaper report dated April 24th, 2002
20        from the Waterbury Republican American.
21             Did you state, We need to get
22        Wilby back on track, and we don't have a
23        lot of time to get it done?
24   A.   Correct.
```

Page 71

```
 1   Q.  Do you recall having meetings with him to
 2       discuss in the aftermath of the transfer
 3       the accreditation itself?
 4   A.  I'm sure I did.
 5                   (Defendants' Exhibit 14
 6       marked for identification.)
 7   BY MR. CAMPBELL:
 8   Q.  Exhibit 14, Doctor, is Exhibit 14 your
 9       response to Dr. Galvin's request which is
10       Exhibit 12 in which he requested an
11       explanation for the reasons for the
12       transfer?
13   A.  Correct.
14   Q.  Again, the July 4th, 2001 incident in
15       Yarmouth played no role in the reasons for
16       the transfer; is that correct?
17   A.  Correct.
18   Q.  Do you recall that Dr. Galvin filed a
19       grievance through his union?
20   A.  Correct.
21   Q.  Pertaining to his transfer; correct?
22   A.  Yes.
23                   (Defendants' Exhibit 15
24       marked for identification.)
```

Page 79

```
 1   Q.   Did the -- was the verbal advice
 2        disciplinary in any way?
 3   A.   It was simply advice that any future
 4        behavior like this that had occurred could
 5        result in some kind of disciplinary action.
 6             MR. CAMPBELL:  Thanks.  Off the
 7        record.
 8                 (Off-the-record discussion.)
 9   BY MR. CAMPBELL:
10   Q.   I want to return, Doctor, to Frank
11        Lombardo.
12             What role, if any, did Frank
13        Lombardo play in your action with respect
14        to the July 4th incident?
15   A.   Not much other than to relay the facts from
16        the Yarmouth Police Department that was
17        given to the Mayor's office to my office.
18        He could have done something else that I
19        don't recall, but I don't recall
20        specifically what it may have been.  It's
21        possible he could have called up there as
22        part of his role with the Mayor's office,
23        his association with the police department,
24        he may have called up there to get some
```