UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-11958-RGS

MARTIN J. GALVIN, JR.

v.

TOWN OF YARMOUTH, et al.

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

January 23, 2007

STEARNS, D.J.

On July 6, 2004, Martin J. Galvin, Jr., a former principal of Wilby High School (WHS) in Waterbury, Connecticut, brought this action against the Town of Yarmouth and two Yarmouth police officers, Chief Peter Carnes and Lt. Steven Xiarhos. Galvin alleges that he lost his WHS principalship after Lt. Xiarhos illegally faxed a police incident report to Waterbury school authorities. The Amended Complaint alleges the unlawful dissemination of Criminal Offender Record Information (CORI), G. L. c. 6, § 172; a violation of the Massachusetts Civil Rights Act (MCRA), G. L. c. 12, §§ 11H and 11I; a violation of the Federal Civil Rights Act, 42 U.S.C. § 1983; and common-law claims for invasion of privacy, tortious interference with contractual relations, and the negligent and intentional infliction of emotional distress.[1]

On September 9, 2004, defendants removed the case to the federal district court

---

[1]The defendants are named generically in each count of the Amended Complaint. From the facts developed in the record, it would appear that Lt. Xiarhos is alleged to have been the primary actor, while Chief Carnes is being sued on a theory of supervisory liability. The Town is presumably named on a theory of municipal liability patterned after Monell v. Department of Social Services, 436 U.S. 658 (1978).

on diversity grounds.  See 28 U.S.C. § 1332.  On March 30, 2006, defendants moved for summary judgment on all counts of the Amended Complaint.  On March 31, 2006, Galvin responded with a cross-motion for summary judgment.  On August 24, 2006, the court heard oral argument.

FACTS

I will begin with the defendants' motion for summary judgment as it is dispositive of the case.  The undisputed facts, which when considering the defendants' motion must be taken in the light most flattering to Galvin, are as follows.  During July of 2001, Galvin was summering in Yarmouth, Massachusetts.  Galvin had previously rented a summer home in Yarmouth owned by Louis and Patricia Nickinello.  Galvin's relationship with the Nickinellos had become strained as a result of their rejection of his offers to buy the house.[2]  On July 4, 2001, a hostile encounter with the Nickinellos' son, Louis Nickinello, Jr., an off-duty Yarmouth police officer, escalated into a shouting and swearing match. Nickinello's children witnessed the confrontation.

Nickinello called the Yarmouth Police complaining that Galvin was vandalizing his property.  According to the officers who responded, Galvin was severely intoxicated,

---

[2]The Nickinellos had earlier brought a summary process (eviction) action against Galvin after he refused to vacate the rental premises voluntarily.

although he was not abusive or belligerent.[3]  Galvin was taken into protective custody.[4]

He was placed in handcuffs, transported to the Yarmouth police station, and held overnight

in a cell.  Galvin was never formally arrested or charged with a crime.[5]

Immediately after Galvin was released, Lt. Xiarhos prepared the following

departmental "incident synopsis."

CONFIDENTIAL
INCIDENT SYNOPSIS

Martin J. Galvin, Jr. has been harassing the Nickinello family again.  On Wed[nesday] 7/4/01 at 1930, Galvin went to Patrol Officer Nickinello's home and made threats and vandalized some property.  Galvin was heavily intoxicated and was verbally abusive to both of Patrol Officer Nickinello's daughters.

YPD responded and placed Galvin in protective custody.
Galvin is an alcohol abuser with 2 previous OUI arrests by YPD.

---

[3]Galvin's blood alcohol content as later measured by a Breathalyzer test was .21. Under the Massachusetts "per se" law, a driver with a percentage by weight of alcohol in his blood of .08 or more is deemed to be operating under the influence.  G.L. c. 90, § 24(1)(a)(1).

[4]G.L. c. 111B, § 8 provides in part that "[a]ny person who is incapacitated may be assisted by a police officer with or without his consent to his residence, to a facility or to a police station."  "Incapacitated" is defined by G.L. c. 111B, § 3 as "the condition of an intoxicated person who, by reason of consumption of intoxicating liquor is (1) unconscious, (2) in need of medical attention, (3) likely to suffer or cause physical harm or damage property, or (4) disorderly."  Galvin's mother and brother, who were present and not drinking, offered to "take care of" Galvin, but the offer was refused by the police.

[5]Defendants argue that because Galvin was taken into protective custody without being formally arrested or charged with a crime, the CORI statute does not apply.  The information disseminated by Lt. Xiarhos, however, also disclosed that Galvin had been previously arrested for operating under the influence. CORI expressly covers "records and data in any communicable form compiled by a criminal justice agency which concern an identifiable individual and relate to the nature or disposition of a criminal charge, an arrest, a pre-trial proceeding, other judicial proceedings, sentencing, incarceration, rehabilitation, or release."  G.L. c. 6, § 167.

>Please keep watch of the Nickinello property and be alert for Mr. Galvin.
>See report 2001014939 7/4/01 for additional details.
>Waterbury PD contacted. Galvin is Wilby High School principal in Waterbury
>Description of Subject . . . .
>Galvin has *no* active MA or CT driver license
>Galvin has active CT License to Carry

Later that day, Lt. Xiarhos faxed the synopsis and several associated police reports to the

Waterbury Public Schools.

On Monday, July 9, 2001, Galvin returned to work at WHS. The next day, he

received a letter from David Snead, the Superintendent of Schools. The letter read as

follows.

>On Friday, July 6, 2001, I was notified that the Yarmouth, MA Police Department had arrested you for threatening and for malicious destruction/vandalism.

>The Yarmouth police have reported to us that on or about 7:30 p.m. on July 4, 2001, you went to the home of a former neighbor, and made threats to him in front of his children aged 8 and 9. These threats included the use of abusive and profane language. It is further reported you were heavily intoxicated and that you vandalized property including a fence and patio chair.

>As a result of this conduct, police were called and you were arrested and placed into protective custody. Please be advised that these criminal charges, if true, [may] result in questions relative to your employment in the Waterbury Public Schools.

>I would like to give you an opportunity to discuss this matter as soon as possible. Please contact me when you receive this letter to arrange a meeting. You are entitled to SAW [union] representation at this meeting if you so choose.

On July 12, 2001, Galvin, together with a union lawyer and the union president, met with

Superintendent Snead. Galvin did not deny his involvement in the incident, but he insisted

that the Yarmouth Police had illegally provided Snead and the school board with protected CORI information.  The lawyers representing both sides agreed with Galvin and the meeting adjourned without any action being taken.

Some ten months later, on April 18, 2002, the New England Association of Schools and Colleges (NEASC) announced that it was revoking WHS's accreditation.  (WHS had been accredited by the NEASC in 1991).  The Waterbury press reported that WHS, uniquely among 641 accredited schools, had failed every accreditation review standard. Four days later, on April 22, 2002, Superintendent Snead removed Galvin as the principal of WHS, naming him instead the principal of the Adult Education High School Program.[6] While the transfer amounted to a reduction in responsibility and prestige, Galvin's salary remained unchanged.

On April 29, 2002, Galvin asked Snead to give the reasons for his transfer.  On May 20, 2002, Snead sent Galvin the following letter.

> My decision to transfer you was made for the best interests of the school-system. In light of the recent report of the New England [A]ssociation of Schools and Colleges, it has become evident to me that a change in leadership was necessary at Wilby High School.
>
> The NEASC reports (sic) describes the following concerning the leadership and organization of Wilby High School:
>
> 1. Lack of vision and leadership at the school.
> 2. Teachers' perception that they are left out of the decision-making process.
> 3. Lack of regularly scheduled faculty meetings.
> 4. The length of time that it takes to resolve student scheduling conflict.
> 5. Lack of teacher collaboration across departments.

---

[6]At oral argument, Galvin's counsel emphasized the fact that the principals of two other Waterbury schools that also failed the accreditation review were not transferred.  It is undisputed, however, that neither of those schools failed *every* accreditation standard.

6. Lack of acknowledgment of teacher's accomplishments.

I recognize that many other deficiencies were cited in the NEASC report that may not be directly related to the school's leadership.

Nonetheless, I share some of these same concerns about Wilby High School's leadership and I feel your skills are better suited to the Adult Education Program, which has been without a permanent principal for over a year.

Snead later testified that while he knew that Galvin had been taken into protective custody, he did not take any disciplinary action as a result (other than warning Galvin in the July 10, 2001 letter about the possible negative consequences of a criminal conviction). Snead maintained that Galvin was transferred solely because WHS had lost its accreditation under Galvin's leadership.

## DISCUSSION

Galvin's Complaint is grounded on an alleged violation of the Massachusetts CORI statute (the transmittal of the July 4, 2001 incident report to Waterbury school officials). This alleged malfeasance underpins Galvin's state-law claims of invasion of privacy, tortious interference with contractual relations, and the negligent and intentional infliction of emotional distress. It is also provides proximal undergirding for Galvin's federal and state civil rights claims.[7] In both his § 1983 and MCRA claims, Galvin alleges that he was deprived of a personal interest in property in derogation of his Fourteenth Amendment

---

[7]A CORI violation, if established, would not give rise to a federal cause of action under § 1983. A violation of state law is not actionable under § 1983 unless the act complained of also violates a secured federal right. Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 106 (1989). The MCRA similarly is concerned with violations of secured rights, not mere violations of laws. Longval v. Commissioner of Correction, 404 Mass. 325, 333 (1989).

6

right to procedural due process. See Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972). Although the property interest at stake in a procedural due process action may be (and almost always is) defined by state law, whether that interest "rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause" is determined by federal constitutional law. Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9 (1978). Of course, not every breach of a contractual right gives rise to a federal constitutional claim; the contractual right at issue must be one deemed significant both by the holder of the right and by the law that protects it. Brown v. Brienen, 722 F.2d 360, 364 (7th Cir. 1983).

The property right identified in the Amended Complaint is Galvin's reputational interest in his tenure as the principal of WHS.[8] Galvin alleges that his involuntary transfer to the Adult Education Program, which he attributes to the CORI disclosure, damaged his reputation and his prospects for future employment opportunities.[9] The Complaint does

---

[8]There is a fundamental legal deficiency inherent to Galvin's claim of a deprivation of a reputational interest. "[R]eputation alone . . . is [n]either 'liberty' [n]or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." Paul v. Davis, 424 U.S. 693, 701 (1976). Galvin has not made a claim under the substantive component of the Due Process Clause. Compare Kallstrom v. City of Columbus, 136 F.3d 1055, 1062 (6th Cir. 1998).

[9]Galvin relies on a Second Circuit case, Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 783 (2d Cir. 1991), which involved a due process claim brought by a doctor in training whose hospital denied her the position of Chief Resident. The court rejected defendants' argument that the doctor had no entitlement to the position, only a unilateral expectation of having the title bestowed on her. The court held that the hospital had not only adopted and followed a policy and practice of awarding the position of Chief Resident to all third year residents on a rotating basis, but that Dr. Ezekwo had been explicitly promised the job by her supervisors. Galvin has cited no similar policy or practice (or promise) that would have led him to reasonably believe that he would be retained indefinitely as the principal of WHS. Moreover, the Ezekwo court held that the only actual

7

not identify the definitional origin of this interest – there is no substantive reference in the Complaint to a contract or state or federal law of any kind defining such an interest[10] – but this much is certain: if there was no CORI violation, any due process claim that Galvin might possess runs against his employers, who are not named as defendants, and not against the Town of Yarmouth and its employees.

> The CORI statute states in pertinent part that:
>
> [c]riminal offender record information, and where present, evaluative information, shall be disseminated, whether directly or through any intermediary, only to (a) criminal justice agencies; (b) such other agencies and individuals required to have access to such information by statute . . . and (c) any other agencies and individuals where it has been determined that the public interest in disseminating such information to these parties clearly outweighs the interest in security and privacy.

G.L. c. 6, § 172. As the Supreme Judicial Court explained in <u>Bellin v. Kelley</u>, 435 Mass. 261, 264 (2001), CORI information may be disseminated in only three statutorily authorized circumstances: (a) to criminal justice agencies for investigative use; (b) to agencies designated as authorized recipients by other statutes; and (c) when the Criminal History Systems Board determines that dissemination of CORI material is in the public interest.    Defendants argue that under subsection (b) of § 172, the dissemination of CORI information is authorized because Massachusetts school officials are required by

---

damage suffered by Dr. Ezekwo was the loss of the pay differential that accompanied the designation as Chief Resident. <u>Id.</u> at 786.  It is undisputed that Galvin suffered no loss of pay because of the transfer.

[10]"A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." <u>Perry v. Sindermann</u>, 408 U.S. 593, 601 (1972).

law to gather CORI information for almost all school employees.

> The school committee and superintendent of any city, town or regional school district and the principal, by whatever title the position be known, of a public or accredited private school of any city, town or regional school district shall have access to and shall obtain all available criminal offender record information from the criminal history systems board of any current or prospective employee or volunteer of the school department, who may have direct and unmonitored contact with children.

G. L. c. 71, § 38R.  Defendants contend that it makes no difference that the information was given for use by a Connecticut rather than a Massachusetts school employer because under Connecticut law, the dissemination of criminal offender records to school employers is also statutorily authorized.  Conn. Gen. Stat. § 10-221d(a)(2) states:

> [o]n and after July 1, 1994, each local and regional board of education shall (1) require each applicant for a position in a public school to state whether such person has ever been convicted of a crime or whether criminal charges are pending against such person at the time of such person's application, (2) require, subject to the provisions of subsection (d) of this section, each person hired by the board after July 1, 1994, to submit to state and national criminal history records checks within thirty days from the date of employment and *may require*, subject to the provisions of subsection (d) of this section, any person hired prior to said date to submit to state and national criminal history records checks . . . . (Emphasis added).

Galvin, in a very convoluted argument, contends that the Connecticut statute, unlike its Massachusetts counterpart, does not make a criminal record check of school employees mandatory.  Therefore, according to Galvin, the dissemination of CORI information to a Connecticut school is not authorized by subsection (b) of the CORI statute, because a Connecticut school board is not *required* to gather criminal offender information; it is simply permitted to do so.[11]  The fatal flaw in Galvin's argument is its failure to grasp the not

---

[11]Even if a material difference existed between the two statutes, Lt. Xiarhos would be entitled to qualified immunity on the federal and state civil rights claims.  Qualified

overly subtle distinction between being required to gather information on the one hand and being authorized to receive it on the other.

Equally fatal for Galvin is his inability – even positing a CORI violation – to establish a causal link between the CORI disclosure and the loss of his principalship at WHS.[12] Galvin argues that his transfer in April of 2002 is directly attributable to the receipt by Superintendent Snead of the CORI information faxed by Lt. Xiarhos in July of 2001. Defendants, however, offer Snead's uncontradicted testimony that he transferred Galvin – not in July of 2001 but in April of 2002 – because of WHS's loss of accreditation under Galvin's leadership and for no other reason. In his May 20, 2002 letter, written well before this lawsuit was filed, Superintendent Snead pointed to the six leadership deficits identified by the NEASC as justification for Galvin's transfer. Galvin offers nothing to challenge Snead's testimony other than a *post hoc ergo propter hoc* argument. Where temporal proximity between an employer's knowledge of protected activity and an adverse employment action is the only evidence offered to show causality, proximity must be "very

---

immunity – even when a constitutional violation is shown – relieves an officer of liability where his actions, even if unconstitutional, would have been reasonably thought by a similarly situated officer not to violate clearly established law. Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003). It cannot be said that Lt. Xiarhos's reliance on subsection (b) of the CORI statute in faxing the incident report to Waterbury school officials was unreasonable or in defiance of any existing controlling authority.

[12]In the alternative, defendants argue that the dissemination was authorized under subsection (c) of the CORI statute because the disclosure of Galvin's drunken public brawl with Nickinello (in the presence of Nickinello's school-age children) to his school employers – calling into question his fitness to serve as a school principal – was in the public interest. While the argument has common sense appeal, subsection (c) applies only to a dissemination of CORI material authorized by a two-thirds vote of the Criminal History Systems Board. Bellin, 435 Mass. at 264.

close." <u>Bishop v. Bell Atlantic Corp.</u>, 299 F.3d 53, 60 (1st Cir. 2002), quoting <u>Clark County</u>

<u>Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001) (per curiam).  Action taken ten months

after the fact, particularly on the heels of a portentous intervening event, "suggests, by

itself, no causality at all."  <u>Id.</u> at 274.[13]

---

[13]Defendants argue that Galvin's MCRA claim can also be dismissed because of Galvin's failure to offer evidence satisfying the required element of threats, intimidation or coercion.  <u>See</u> <u>Bally v. Northeastern University</u>, 403 Mass. 713 719-720 (1989).  Galvin argues that he was confronted with an implicit economic threat because of defendants' attempt to interfere with his employment contract with the Waterbury public schools.  <u>See</u> <u>Redgrave v. Boston Symphony Orchestra, Inc.</u>, 399 Mass. 93, 95 (1987) (defendant acquiesced to third party pressure to terminate plaintiff's vested contractual rights). Assuming that Galvin had some kind of vested right to the principalship of WHS – there is no evidence that he did – he is unable to show that any actual damages resulted from the alleged interference with that right.  At the hearing, the court dismissed Galvin's claim that the CORI disclosure adversely affected the financial terms of his final divorce decree. There is simply no evidence to support the allegation that the CORI disclosure in any way influenced the judgment entered by the Family Division of the Superior Court.

<u>ORDER</u>

For the foregoing reasons, Galvin's cross-motion for summary judgment is <u>DENIED</u>.

Defendants' motion for summary judgment is <u>ALLOWED</u>.  The Clerk will enter judgment

for the defendants on all counts of the Amended Complaint.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE